## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

JOSE GARCIA,

          Plaintiff,

    v.

VILLAGE OF LAKE DELTON, a
municipal corporation, Lake Delton
Detective SHAWN POSEWITZ, Lake
Delton Detective LUCAS KILLICK, Sauk
County District Attorney MICHAEL X.
ALBRECHT, in his official capacity,
Assistant District Attorney RICK
SPOENTGEN, Assistant District Attorney
Linda HOFFMAN, COUNTY OF SAUK, a
municipal corporation,

No.    20 CV 988

*Jury Trial Demanded.*

## <u>COMPLAINT AT LAW</u>

NOW COMES Plaintiff JOSE GARCIA, through his counsel, Law Office of
Jordan Marsh, complaining of the Defendants, VILLAGE OF LAKE DELTON, a
municipal corporation, Lake Delton Detective SHAWN POSEWITZ, Lake Delton
Detective LUCAS KILLICK, Sauk County District Attorney MICHAEL X.
ALBRECHT, in his official capacity (hereinafter referred to as "SAUK COUNTY
DISTRICT ATTORNEY"),   Assistant District Attorney RICK SPOENTGEN,
Assistant District Attorney LINDA HOFFMAN, and COUNTY OF SAUK, a
municipal corporation, and states the following:

## INTRODUCTION

1.  On the morning of October 4, 2016, Chicago Police Sergeant Jose Garcia went to work as he always did – as he had for the previous 21 years – to serve and protect the people of the city of Chicago.

2.  By late morning, Jose found himself arrested, stripped of his police powers, and charged with criminal sexual assault of a 15-year old girl.  He would spend the next two nights in jail cells in two different states, and the next two years fighting for his life, his savings, his reputation, and his freedom, all based on obviously meritless allegations of a crime that never occurred.

3.  The defendants in this case caused Jose's wrongful arrest and pursued a hopelessly flawed investigation, ignoring and failing to follow up on countless red flags that undermined the allegations against him.

4.  Defendants failed to abide by accepted investigatory standards relating to investigations of alleged sex crimes against children.  They continued to pursue his conviction on two counts of Sexual Assault that could have effectively resulted in a life sentence for Jose and bankrupted his family.

5.  Defendants blindly and zealously pursued Jose's conviction despite the absence of a single eyewitness, despite contradictory statements by the alleged victim and her family on materials issues, despite the fact that surveillance video refuted the allegations, and despite the inherent implausibility of the allegations.

6. Defendants effectively destroyed and failed to preserve key exculpatory evidence, and omitted key facts from police reports, depriving Jose of a fair trial and of his due process rights under the United States Constitution.

## JURSDICTION AND VENUE

7. This action arises under the Constitution of the United States, particularly the Fourth and Fourteenth Amendments to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988, and under the laws of the State of Illinois.

8. The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, Sections 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

9. Venue is proper in the United States District Court for the Western District of Wisconsin under Title 28 of the United States Code, Section 1391(b)(2), as the events complained of occurred within this district.

## PARTIES

10. Plaintiff JOSE GARCIA (hereinafter "Jose") is 48 years old. Jose has been a Chicago police officer since 1995. At the time of the incidents in question, Jose was a Sergeant of Detectives. Jose is a loving father, husband, and son. At all relevant times, Jose was a resident of the City of Chicago, County of Cook, State of Illinois, and a citizen of the State of Illinois.

11. Defendant VILLAGE OF LAKE DELTON is a municipal corporation organized, existing and doing business under the laws of the State of Wisconsin, and at all times relevant provided police services in the VILLAGE OF LAKE DELTON through the Lake Delton Police Department.

12. Defendant Detective SHAWN POSEWITZ (hereinafter "Defendant POSEWITZ") was at all times relevant, a sworn police officer and detective employed by Defendant VILLAGE OF LAKE DELTON, and was acting within the scope of his agency, service and/or employment with the VILLAGE OF LAKE DELTON, and was acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Wisconsin. Defendant POSEWITZ is sued in his individual capacity.

13. Defendant Detective LUCAS KILLICK (hereinafter "Defendant KILLICK") was at all times relevant, a sworn police officer and detective employed by Defendant VILLAGE OF LAKE DELTON, and was acting within the scope of his agency, service and/or employment with the VILLAGE OF LAKE DELTON, and was acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Wisconsin. Defendant KILLICK is sued in his individual capacity.

14. Defendant MICHAEL X. ALBRECHT, is the District Attorney for Sauk County, Wisconsin. He is sued in his official capacity.  This defendant is being sued for indemnification only.

15. Defendant RICK SPOENTGEN was, at all times relevant, an Assistant District Attorney for Sauk County, Wisconsin, and was acting within the scope of

his agency, service and/or employment as an Assistant District Attorney for Sauk County, Wisconsin, and was acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Wisconsin. Defendant SPOENTGEN is sued in his individual capacity.

16. Defendant LINDA HOFFMAN was, at all times relevant, an Assistant District Attorney for Sauk County, Wisconsin, and was acting within the scope of her agency, service and/or employment as an Assistant District Attorney for Sauk County, Wisconsin, and was acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Wisconsin. Defendant HOFFMAN is sued in his individual capacity.

17. Defendant COUNTY OF SAUK is a municipal corporation organized, existing, and doing business under the laws of the State of Wisconsin. This defendant is being sued for indemnification only.

<u>FACTS</u>

Family Vacation

18. On or about August 15 through August 19, 2016, Jose and his family were vacationing in the Wisconsin Dells, Wisconsin. The Garcias were vacationing with another family, the Cichocki family. Both families lived in Chicago, and had known each other for several years. The families had vacationed together on prior occasions.

19. In August 2016, the Garcias and the Cichocki family shared a suite at the Glacier Canyon Resort in Wisconsin Dells, Wisconsin. The families spent most of

the daylight hours together at the resort's water park.  They spent almost every waking hour together, except one morning when Jose went golfing with Anthony Cichocki.

20. On August 18, 2016, the families had breakfast together and spent the bulk of the day at the water park swimming and playing.  That evening, the families ate dinner together, and then all except two of Jose's daughters and GC went to the resort's indoor wave pool, which was open later than the outdoor pools.[1]  Jose's two daughters and GC stayed in the room to bake cookies.

21. The following day – August 19, 2016 – the Garcias and the Cichockis had breakfast together in their suite and then checked out of the resort, but spent several hours together at the water park after checking out.

22. As the families were saying goodbye, GC, then 15 years old, and her mother Monique, each gave Jose a hug and a kiss on the cheek. The Garcias and the Cichockis drove home separately.

### Jose's Arrest

23. On the morning of October 4, 2016, Jose was at work on the street, supervising a team of officers working with the U.S. Bureau of Alcohol, Tobacco, and Firearms, investigating gang-related firearm violations, when he was directed to return to the Detective Area 1 police station, at 5101 South Wentworth Street.

24. When Jose returned to the station, his Lieutenant and his Commanding Officer, were waiting for him in the Lieutenant's office.

---

[1] The alleged victim, who was a minor on the date in question, will be referred to herein as "GC".

25. Jose's Lieutenant informed him that two detectives from Wisconsin were there with an arrest warrant for sexual assault, and that Jose would be immediately relieved of his police powers and taken into custody.

26. Jose was taken to the Chicago Police Department Bureau of Internal Affairs, where he was formally relieved of his police powers.

27. Two Lake Delton detectives – Defendants POSEWITZ, and KILLICK – conducted a videotaped interrogation of Jose. The detectives informed Jose that he was alleged to have assaulted GC in August, 2016. This was the first Jose had heard of any allegations of wrongful conduct stemming from the August vacation.

28. Jose later learned that he was being charged with two counts of 2nd Degree Assault of a Child, a Class C felony, and that each count carried a fine of up to $100,000 and up to 40 years in prison.

29. During the interrogation, Defendant POSEWITZ told Jose that "You're a fellow officer. That's a big deal to us."

30. During the interrogation, Defendant POSEWITZ told Jose that "the prosecutors" wanted him back in Wisconsin and that "it wasn't our decision".

31. On information and belief, Defendant SPOENTGEN and/or Defendant HOFFMAN obtained the arrest warrant on the morning of October 4, 2016.

32. After initially declining to answer questions based on his attorney's advice, Jose forcefully denied the allegation, characterizing it as "a bullshit allegation." When Defendant POSEWITZ provided Jose with some of the specifics of the

allegation, Jose stated, "That's not true." Moments later, Jose said, "I didn't do anything wrong."

33. Jose's emphatic denials never found their way into Detective POSEWITZ's report of the interrogation.

34. In his report, Defendant POSEWITZ stated only that Jose "stated he had been advised by his Attorney to respectfully not speak to us regarding this case", and omitted any mention of his denials.

35. In omitting this Jose's denials, Defendant POSEWITZ falsified his police report, depriving Jose of exculpatory evidence and violating Jose's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

36. Defendant KILLICK was aware that the report was false and incomplete, but failed to take any steps to correct it.

37. While they did not actually arrest him because they had no jurisdiction in Illinois, Defendants POSEWITZ and KILLICK caused and effectuated Jose's arrest.

38. By seeking the arrest warrant and signing the criminal complaint, Defendant SPOENTGEN caused and effectuated Jose's arrest.

39. On information and belief, Defendant HOFFMAN caused and effectuated the arrest by directing the detectives to go down to Chicago to effectuate Jose's arrest.

40. Despite the absence of probable cause to arrest Jose, at no time did any of the defendants attempt to halt Jose's arrest or point out that the arrest lacked probable cause.

41. On information and belief, it is far more common in criminal cases in Wisconsin for the district attorney to issue a summons rather than seek an arrest warrant.

42. A summons is mailed to the defendant and directs the defendant to appear in court on a specified date and time.

43. Issuance of a summons allows a defendant to obtain and consult with counsel, and to understand the specific charges against him.

44. As a well-regarded and highly respected Chicago police sergeant, there was no reason to believe that Jose would not have appeared in court pursuant to a lawfully issued summons.

45. Defendants in this case chose to seek and obtain an arrest warrant, showing up in Chicago with no notice, causing Jose to be pulled off the street and to face questioning without warning and without counsel. This was a particularly confrontational and provocative tactic, and it caused Jose unnecessary pain and trauma.

46. After the interrogation, Jose, who was an on-duty Chicago Police Sergeant hours earlier, was arrested, fingerprinted, and detained overnight in a Chicago police lockup facility on a "Fugitive from Justice" warrant.

47. The next morning, Jose appeared in Cook County bond court and was released on an individual recognizance bond. He immediately drove to Sauk County, Wisconsin, to face the charges against him.

48. Jose was placed in custody and spent the night in the Sauk County Jail before being released the following day after posting a $1,000 bond.

49. As a result of his arrest, Jose was subject to the following requirements and prohibitions, which constituted serious and long-term limitations of his freedom and liberty:

    a. As a condition of his Cook County bond, Jose was prohibited from contacting any complaining witnesses or their immediate families.  He was ordered to appear at all court dates. Any violation of these conditions could have resulted in his arrest and imprisonment.

    b. As a condition of his Sauk County bond, Jose was prohibited from contact with the Cichocki family or with any female children under the age of 18 except his children throughout the prosecution.  Any employment-related contact with children other than GC and her siblings was required to be telephonic. Any in-person employment-related contact with children other than GC and her siblings had to be supervised by another law enforcement officer. Jose was required to appear for all court dates, and send written notice of any change of address to the Sauk County Clerk.  Any violation of these conditions could have resulted in a warrant for his arrest and imprisonment.

As a result, Jose could no longer coach his daughter's volleyball team, attend his children's school activities, participate in his son's Boy Scout

activities or camping trips, teach religious class at his parish, or attend family gatherings.

c. From the time of his arrest, and continuing to this day, Jose was stripped of his police powers, and prohibited from carrying his service weapon or working secondary employment. He was forced to surrender his Chicago police star, shield, and identification card.  He continues to be subjected to an administrative investigation by the Chicago Police Department Bureau of Internal Affairs. Throughout this time, Jose has been deprived of income related to overtime opportunities which traditionally amounted to approximately $50,000 to $60,000 annually. Jose has also been deprived of reassignment and promotional opportunities.

## Monique Cichocki Files Initial Report by Phone

50. The allegations against Jose arose from a report filed by telephone on August 23, 2020, by GC's mother, Monique Cichocki, who provided a detailed account of the alleged sexual assault by Jose, as told to her by GC, including the following statements, to Lake Delton Officer Troy Spencer:

a. While all the kids were playing in the pool, Jose was throwing the kids – including GC – into the water.

b. Before he threw GC up in the air, Jose inappropriately touched GC on her breasts and vagina above her bathing suit.

c. GC advised her mother that after being touched that one time by Jose, he approached her a second time and asked if she liked it. GC advised her mother she told Jose no and exited the pool.

11

    d.  Jose later approached GC at a table and told her he was sorry, but he liked her.  He had her "pinky swear" not to tell anyone.

    e.  Jose approached GC again inside the families' shared condominium, and asked if she wanted him to touch her.

    f.  GC informed her mother that Jose only touched her inappropriately once, but she felt uncomfortable being around Jose.

51. Officer Spencer documented Monique's statements in a report.

### Defendant POSEWITZ interviews Monique

52. On August 25, 2016, Defendant POSEWITZ conducted a videotaped interview of Monique.

53. Defendant POSEWITZ's interview with Monique consisted largely of Monique speaking almost entirely uninterrupted, with few if any follow-up questions or requests for clarification by Defendant POSEWITZ.

54. Defendant POSEWITZ never asked Monique about the facts alleged in her August 23 telephone report, nor did he ask her any questions at all related to that report.

55. In her interview with Defendant POSEWITZ, Monique informed him that GC told her that Jose assaulted her after Monique and her husband Anthony had gone up to the condominium to heat up dinner, which Monique estimated at 5:30 to 6:00.

56. Monique advised Defendant POSEWITZ that GC became upset and afraid when she learned that there was surveillance video of the pool where the alleged assaults occurred.

57. Monique also admitted during her interview that after the Cichocki family returned home from Wisconsin and informed GC's brother about her allegations,

12

she made sure that GC and her brother worked together "so you guys can try to remember together what happened, and by you telling her where things were, maybe it will help her."

58. Defendant POSEWITZ did not follow up on Monique's admission or inquire about which facts GC and her brother discussed together.

59. During Monique's interview on August 25, she referred to notes that she had brought with her, which she folded up and placed into her purse at the end of the interview. Neither Defendant POSEWITZ nor Defendant KILLICK ever obtained or reviewed Monique's notes, asked her about them, or sought to obtain them.

60. Defendant POSEWITZ never documented the existence of these undisclosed notes in any report, nor did he ever explain why he failed to ask Monique about them or to obtain them to determine what they contained.

61. During Monique's interview, she described a conversation with a co-worker who suggested that because Jose had a family member who had been sexually assaulted, "maybe he is trying to be stopped because he chose to do this to you and he knows you won't back down."

62. Monique stated to Defendant POSEWITZ that "if I have to be the one to take him down to stop him, then that is going to be my job, you know, and he chose me to do that, I guess."

63. Defendant POSEWITZ did not follow up or inquire further about Monique's bizarre and troubling theory that Jose assaulted her daughter as a way to get

Monique to stop him from doing something. Nor did Defendant POSEWITZ follow up on Monique's statement that she intended to "take [Jose] down."

### Defendant POSEWITZ Interviews GC

64. On August 25, 2016, Defendant POSEWITZ conducted a videotaped interview of GC.   During the interview, GC made numerous contradictory statements about the incident, as well as allegations of specific actions that were highly implausible if not physically impossible.

65. GC's statements to Defendant POSEWITZ were factually irreconcilable with the account her mother provided on August 23.   For instance, she stated that Jose assaulted her on two separate occasions, ten minutes apart, flatly contradicting her mother's August 23 statement that there was only one assault.

66. GC did not tell Defendant POSEWITZ that Jose approached her in the pool to ask her if she liked it, as her mother claimed in her August 23 report.

67. GC stated to Defendant POSEWITZ that Jose approached her in the condominium and asked her if she liked what he had done, that he hugged her, and that she said he needed to get off her.

68. The hug would have been a third incident of unwanted and/or inappropriate contact, further contradicting Monique's August 23rd statement that GC told her there was only one incident.

69. Defendant POSEWITZ never followed up on these alarming discrepancies.

70. During her August 25 interview, GC informed Defendant POSEWITZ that the alleged assaults occurred "by like the slides and everything right there".

71. On or around August 30 of 2016, Defendant POSEWITZ emailed Monique with photos of the pool and asked her to work with GC and "figure out which picture best describes the area [GC] was in, and maybe circle the specific area within the picture where they were located." Monique responded the same day with two photos marked, neither of which was near the slides.

72. Defendant POSEWITZ did not follow up on this discrepancy.

73. In the same email, Monique said that "it was near where the lifeguard is standing."

74. The August 30, 2016 email exchange between Monique and Defendant POSEWITZ was not provided to Jose or his attorney until April 10, 2018. Defendant POSEWITZ did not provide the exchange to the State until Defendant Hoffman requested emails between POSEWITZ and Monique on April 10, 2018.

75. Defendant HOFFMAN provided the emails to Jose's attorney only after Jose's attorney requested all emails from Monique to law enforcement.

76. The emails contained key exculpatory evidence.

77. Defendant POSEWITZ deliberately withheld this exculpatory information from the defense in violation of *Brady v. Maryland,* 373 U.S. 83 (1963).

78. During his interview with GC, Defendant POSEWITZ suggested/fed words to GC. For instance, it was Defendant POSEWITZ – not GC – who first brought up the name Jose Garcia as the man who allegedly assaulted her.

79. Defendant POSEWITZ suggested to GC that Jose inappropriately touched her underwater so no one could see his hands.

15

80. Defendant POSEWITZ validated GC's response to one of his questions by stating, "perfect."

81. When GC told Defendant POSEWITZ that each alleged assault took two minutes, Defendant POSEWITZ suggested that it was two seconds rather than two minutes. But GC maintained that each incident lasted two minutes.

82. On two separate occasions during her August 25 interview with Defendant POSEWITZ, GC referenced a "report" in which she had previously stated some of the facts she was telling POSEWITZ.   Defendant POSEWITZ did not follow up on what GC meant by this report.  Neither Jose nor his criminal defense attorney were ever provided with a report that predated the August 25 interview that GC could have been referring to.[2]

83. On April 11, 2017, Defendant POSEWITZ emailed Defendant HOFFMAN, stating that he believed the "report" GC was referring to was actually her mother's verbal statement to him and another officer over the phone and in her interview. That email was never turned over to Jose or his defense attorney until weeks before the trial in April 2018.  Nor did Defendant POSEWITZ ever confirm his suspicions with Monique.

84. Throughout GC's August 25 statement, Defendant POSEWITZ never followed up on or documented the glaring inconsistencies between Monique's statements on August 23rd and GC's statements on August 25.

---

[2] The only report provided to Jose or his attorney predating the August 25 interview was the August 23 report which did not include the details referred to by GC in her interview.

16

85. During her August 25 interview, GC confirmed that on the first alleged assault, Jose was sitting on the bottom of the pool on his knees, sitting on his heels, with GC on his lap for two minutes while he allegedly touched her breasts.

86. Defendant POSEWITZ never went to the pool to determine whether Jose, who is 5' 8" tall, could have been seated in the position described by GC with his head above water.  If he had done so, he would have learned that Jose's entire head would have been underwater up to his forehead, as the water was three feet six inches deep in the area where GC claimed the assaults occurred.

87. In order to justify his failure to locate or identify lifeguards who were in the vicinity of the alleged assaults, Defendant POSEWITZ later testified that it would be "close to impossible" for a lifeguard to see something under the water.  He provided no facts to support this statement, and on information and belief, Defendant POSEWITZ never went to the pool to determine if indeed it would have been impossible for anyone else to see Jose's hands under water, as GC had claimed (after prodding from POSEWITZ).  If he had done so, he would have realized that the water was perfectly clear and would not have obscured Jose's hands under the surface.

88. Defendant POSEWITZ did not travel to Chicago to effectuate Jose's arrest until October 4, 2016 – 42 days after the Cichokis filed their report.  Yet during that time, the only witnesses he interviewed were GC and her mother. He did not interview GC's father and brother until after Jose's arrest.

## Video Footage of the Pool

89. Defendant POSEWITZ viewed surveillance video of the scene of the alleged sexual assaults on August 26. He did not observe two bodies together for anything approaching two minutes.

90. On October 10, 2016, Defendant POSEWITZ' and Defendant KILLICK had GC, her mother Monique, her father and brother watch the video footage together in an attempt to locate GC or anyone in her family in the pool area.

91. Initially, Defendant KILLICK, at Defendant POSEWITZ's direction, went over the video with the Cichocki family. At some point, Defendant KILLICK left and Defendant POSEWITZ continued to review the video with GC and her family.

92. On information and belief, Defendant POSEWITZ never documented the subsequent portion of the video session with the Cichocki family.

93. Having multiple witnesses view the video together at the same time was an egregious violation of accepted law enforcement standards, as it results in contaminated memories of the witnesses.

94. Defendant POSEWITZ never identified any witnesses who observed Jose sexually assault GC, despite the fact that the alleged assault was said to have occurred in a crowded swimming pool with members of both families present, and a lifeguard nearby.

95. Defendant POSEWITZ never attempted to interview any member of Jose's family, all of whom were in or around the pool at the time of the alleged assault.

96. Defendant POSEWITZ did not attempt to interview Jose until the moment of his arrest – with no advance warning, and no opportunity to have counsel present – when he was called into his commander's office and informed he would be arrested and stripped of his police powers.

### The Missing Lifeguard

97. GC stated in her August 25 interview that the alleged assaults took place "by the lifeguard", but Defendant POSEWITZ omitted this important fact from his five-page report of the interview.

98. By omitting the key fact that there was a lifeguard in proximity to where GC alleged she was assaulted, Defendant POSEWITZ falsified his report, depriving Jose of exculpatory evidence and violating Jose's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

99. Defendant POSEWITZ testified in 2018 that he spoke with either the resort's security director James Pugh or the resort manager Callie Northcott in August 2016, and that he asked one of them (he claimed he did not remember which one) "if there was descriptions of who the lifeguards were at certain positions."

100. Defendant POSEWITZ testified he was informed that such information was not documented.

101. Defendant POSEWITZ testified that after he asked the one question about lifeguards on August 26, 2016, he made no further attempt to identify any lifeguards who may have been working on the date in question until 18 months later, when he saw the Aquatics Director's name on the defense witness list.

102. The resort manager, Callie Northcott, stated in a sworn affidavit that Defendant POSEWITZ mentioned something about lifeguards but that she informed him she knew nothing about lifeguards, and he should speak with someone in the Aquatics department.

103. The Aquatics director, Brandon Schindler, stated in an affidavit that Defendant POSEWITZ did not speak with him or any Aquatics staff member until April 2018.  He stated that if Defendant POSEWITZ had spoken with him or any Aquatics manager within two to three weeks after the incident, they likely would have been able to identify the lifeguards who were working on the date in question, and they would probably have still been employed at that time.

104. Defendant POSEWITZ testified in 2018 that he did not know anything about an Aquatics director until he saw the Aquatics Director's name on the defense witness list, despite the resort manager's sworn testimony that she informed POSEWITZ in 2016 that he should contact the Aquatics director.

105. Defendant POSEWITZ testified that he took no action to identify any lifeguards after August 26, 2016 in part because in his experience conducting sexual assault investigations, lifeguards "generally don't see anything on the day even that we're called".

106. Defendant POSEWITZ never documented his interaction with Pugh or Northcott in any report.

107. As a result of Defendant POSEWITZ's failure or refusal to follow up on Callie Northcott's suggestion to contact the resort's Aquatics Department, neither Jose nor

his defense attorney ever had an opportunity to speak with any of the on-duty lifeguards, depriving Jose of important exculpatory evidence.

108. Defendant POSEWITZ's failure or refusal to speak with anyone from Aquatics amounted to destruction of and/or failure to preserve exculpatory evidence, violating Jose's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### The Prosecution and Mistrial

109. Defendants pursued Jose's prosecution for 18 months.

110. Throughout the prosecution, Defendants POSEWITZ and KILLICK actively pursued the prosecution, and neither of them ever attempted to halt it or expressed concerns regarding the voluminous flaws in the case, despite having numerus opportunities to do so.

111. Throughout the Defendants' prosecution of Jose, they repeatedly refused to look objectively at the merits of the case and acknowledge that there was no credible evidence establishing probable cause to prosecute, let alone evidence sufficient to convict him.

112. From the moment of the arrest, and throughout the prosecution, Jose insisted he was innocent, even successfully submitting to a polygraph, which concluded his denials were not deceptive.

113. Despite being protected by the Fifth Amendment from having to testify in a criminal case against him, Jose always intended to testify in his defense.  In fact,

his attorney promised the jury in opening statements that Jose would testify in the case.

114. During the State's opening statement at trial, Defendant HOFFMAN claimed that GC would testify that there was only one assault – consistent with Monique's August 23 phone report, but dramatically inconsistent with GC's videorecorded statement to Defendant POSEWITZ.

115. During the State's opening statement at trial, Defendant HOFFMAN stated that GC had learning disabilities that caused her to read at a sixth grade level. This information, presented to mitigate GC's inherently implausible and demonstrably false claim that Jose assaulted her twice for two full minutes each time, had never been provided to the defense.

116. Defendant HOFFMAN asserted that GC had learning disabilities despite knowing that GC's father had stated just the opposite: that GC was "very normal" and "very smart".

117. As a result of Defendant HOFFMAN's statement to the jury inserting a new issue in the case that had never been disclosed to Jose or his attorney (and were demonstrably false), the Court declared a mistrial.

118. Despite numerous attempts by Jose's counsel to persuade the District Attorney to dismiss the case with prejudice due to the complete lack of credible evidence, the District Attorney insisted on re-trying Jose, going so far as to schedule a second trial.

119. Finally, on October 1, 2018, nearly six months after the first trial ended in a mistrial and two years after Jose was falsely arrested and charged, the District Attorney moved to dismiss the charges against Jose, stating that **"[t]he State will not be able to present sufficient credible evidence at trial to prove the charged offenses."**

120. Nothing had changed in terms of the evidence in the case from the moment of Jose's arrest until the State declared that it would not be able to present "sufficient credible evidence" to prove that Jose was guilty.

121. The State had never possessed "sufficient credible evidence" – or *any* credible evidence – to convict Jose, nor had it ever possessed "sufficient credible evidence" to arrest, charge, or prosecute him.  Yet the Defendants arrested, charged, and prosecuted Jose anyway, unhindered and unbothered by the lack of probable cause to believe that he had committed any crime.

122.  On October 10, 2018, the charges were dismissed against Jose in a manner indicative of his innocence.

### Jose's Damages

123. From the moment Jose was called in off the street in the late morning of October 4, 2016, his life has never been the same.  Nor will it ever be the same.

124. In the space of a few hours, Jose went from being a decorated, respected Sergeant of Detectives, to an arrestee and criminal defendant accused of sexually assaulting a 15-year old girl, spending two successive nights incarcerated in two different states.

125. Jose's name and face were plastered on media outlets and in social media with headlines referencing his arrest for sexually assaulting a 15-year old girl.

126. Jose lost many friends, as his arrest – and his mug shot – were featured on social media and the news media as an accused sex offender.  One website headlined the article about Jose "2016 Cop Pedophile Jose Garcia", with Jose's mug shot prominently displayed.

127. The following 24 months were a living nightmare for Jose, who was forced to defend himself while contemplating the possibility of spending the rest of his life in prison for a crime he knew he did not commit –  a crime that never even occurred – while parenting his children and continuing to be a good father and husband.

128. The emotional pain and suffering Jose endured over two years as a result of the Defendants' misconduct was enormous.  He was deprived of the basic pleasures of life: attending family gatherings, coaching his daughter's volleyball team, teaching religious classes at his parish, and attending Boy Scout activities and camping trips with his son.

129. Jose incurred approximately $100,000 in expenses defending against the baseless charges against him, and to date has lost more than $200,000 in income.

130. To this day, Jose remains stripped of his police powers while the Chicago Police Department decides his fate, two years after the charges against him were dismissed.

131. Jose's faith in law enforcement and the justice system has been profoundly shaken, a particularly damaging condition for a career police officer.

132. In the end, Jose is left to contemplate what he first articulated the day of his arrest: a life spent doing nothing but good was not enough to protect him from overzealous and undisciplined police officers and prosecutors putting Jose and his family through an unimaginable ordeal, only to dismiss the charges after two years with an acknowledgement that they lacked the evidence to convict him after all.

## COUNT I – FEDERAL CLAIM
## FALSE ARREST
## DEFENDANTS POSEWITZ, KILLICK, SPOENTGEN, AND HOFFMAN

133. Each paragraph of this Complaint is incorporated as if restated fully herein.

134. Defendant POSEWITZ and KILLICK caused Jose to be arrested without probable cause to believe he had committed a crime, in violation of the Fourth Amendment to the U.S. Constitution.

135. Defendant SPOENTGEN sought an arrest warrant for Jose despite having no probable cause to believe Jose had committed a crime, in violation of the Fourth Amendment to the U.S. Constitution.

136. Defendant HOFFMAN directed Defendants POSEWITZ and KILLICK go down to Chicago to effectuate Jose's arrest despite having no probable cause to believe Jose had committed a crime, in violation of the Fourth Amendment to the U.S. Constitution.

137. At all times relevant, Defendants POSEWITZ and KILLICK were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Wisconsin, and within the scope of their employment as Lake Delton police officers.

138.  At all times relevant, Defendants SPOENTGEN and HOFFMAN were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Wisconsin, and within the scope of their employment as Assistant District Attorneys for Sauk County.

139. As a proximate cause of Defendants' misconduct, Jose suffered loss of liberty, physical and mental anguish, emotional pain and suffering, lost wages and financial hardship.

WHEREFORE, the Plaintiff, JOSE GARCIA, prays for judgment against Defendants POSEWITZ, KILLICK, SPOENTGEN and HOFFMAN in a fair and reasonable amount, including compensatory and punitive damages, attorney's fees and costs, and for any additional relief this Court deems just and proper.

**COUNT II – FEDERAL CLAIM**
**UNLAWFUL DETENTION**
**DEFENDANTS POSEWITZ AND KILLICK**

140.  Each paragraph of this Complaint is incorporated as if restated fully herein.

141. Defendants POSEWITZ and KILLICK initiated and continued criminal charges against Jose without probable cause and with malice, resulting in deprivation of his liberty without probable cause, in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution

142. Defendants POSEWITZ and KILLICK accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that

they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments to the U.S. Constitution.

143. The charges were dismissed against Jose on October 8, 2018, in a manner indicative of his innocence.

144. As a proximate cause of Defendant's misconduct, Jose suffered loss of liberty, physical and mental anguish, emotional pain and suffering, and lost wages and financial hardship.

WHEREFORE, the Plaintiff, JOSE GARCIA, prays for judgment against Defendants POSEWITZ and KILLICK in a fair and reasonable amount, including compensatory and punitive damages, attorney's fees and costs, and for any additional relief this Court deems just and proper.

## COUNT III – FEDERAL CLAIM
## VIOLATION OF DUE PROCESS
## DEFENDANTS POSEWITZ AND KILLICK

145. Each paragraph of this Complaint is incorporated as if restated fully herein.

146. Defendants POSEWITZ and KILLICK caused Jose to be detained unreasonably and without probable cause, resulting in his unlawful detention, in violation of the Fourteenth Amendment to the U.S. Constitution.

147. As described more fully above, the Defendants fabricated reports, destroyed and/or failed to preserve exculpatory evidence, withheld exculpatory evidence, and otherwise deprived Jose of a fair trial, in violation of the Fourteenth Amendment to the U.S. Constitution.

148. The charges were dismissed against Jose on October 10, 2018, in a manner indicative of his innocence.

149. As a proximate cause of Defendants' misconduct, Jose suffered loss of liberty, physical and mental anguish, emotional pain and suffering, and lost wages and financial hardship.

WHEREFORE, the Plaintiff, JOSE GARCIA, prays for judgment against Defendants POSEWITZ and KILLICK in a fair and reasonable amount, including compensatory and punitive damages, attorney's fees and costs, and for any additional relief this Court deems just and proper.

### COUNT IV – FEDERAL CLAIM
### FAILURE TO INTERVENE
### DEFENDANTS POSEWITZ, KILLICK, SPOENTGEN AND HOFFMAN

150. Each paragraph of this Complaint is incorporated as if restated fully herein.

151. One or more of the Defendants had a reasonable opportunity to prevent the violation of Jose's constitutional rights as set forth above, but failed to do so.

152. As a result of Defendants' unconstitutional failure to intervene, Jose suffered loss of liberty, physical and mental anguish, emotional pain and suffering, and lost wages and financial hardship.

WHEREFORE, the Plaintiff, JOSE GARCIA, prays for judgment against Defendants POSEWITZ, KILLICK, SPOENTGEN and HOFFMAN in a fair and reasonable amount, including compensatory and punitive damages, attorney's fees and costs, and for any additional relief this Court deems just and proper.

## COUNT V – STATE CLAIM
## MALICIOUS PROSECUTION
## VILLAGE OF LAKE DELTON

153.  Each paragraph of this Complaint is incorporated as if restated fully herein.

154.  Defendant VILLAGE OF LAKE DELTON, by and through its agents, Defendants POSEWITZ and KILLICK, initiated and/or continued a judicial proceeding against Jose without probable cause, and with malice.

155.  The proceeding terminated on October 8, 2018, in favor of Jose, and in a manner indicative of his innocence.

156.  As a proximate cause of Defendant's misconduct, Jose suffered loss of liberty, physical and mental anguish, emotional pain and suffering, and lost wages and financial hardship.

WHEREFORE, the Plaintiff, JOSE GARCIA, prays for judgment against Defendant VILLAGE OF LAKE DELTON in a fair and reasonable amount, including compensatory and punitive damages, attorney's fees and costs, and for any additional relief this Court deems just and proper.

## COUNT VI – STATE CLAIM
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## VILLAGE OF LAKE DELTON

157.  Each paragraph of this Complaint is incorporated as if restated fully herein.

158.  The foregoing conduct of Defendant Village of Lake Delton, by and through its agents, Defendants POSEWITZ and KILLICK, was intentional, extreme and outrageous.

159. As a direct and proximate result of Defendant's conduct, Jose suffered loss of liberty, physical and mental anguish, extreme and disabling emotional injuries, and lost wages and financial hardship.

WHEREFORE, the Plaintiff, JOSE GARCIA, prays for judgment against Defendant VILLAGE OF LAKE DELTON in a fair and reasonable amount, including compensatory and punitive damages, attorney's fees and costs, and for any additional relief this Court deems just and proper.

**COUNT VII -- STATE LAW CLAIM**
**INDEMNIFICATION**
**COUNTY OF SAUK, SAUK COUNTY DISTRICT ATTORNEY**

160. Each paragraph of this Complaint is incorporated as if restated fully herein.

161. At all relevant times, COUNTY OF SAUK and SAUK COUNTY DISTRICT ATTORNEY were the employers of Defendants SPOENTGEN and HOFFMAN.

162. Defendants SPOENTGEN and HOFFMAN committed the acts alleged above under color of law and in the scope of their employment as employees of the COUNTY OF SAUK and SAUK COUNTY DISTRICT ATTORNEY.

163. Wisconsin law provides that governmental entities are directed to pay any tort judgment for any damages for which employees are liable within the scope of their employment activities.

164. WHEREFORE, should Defendants SPOENTGEN and/or HOFFMAN be found liable on one or more of the claims set forth above, the Plaintiff, JOSE GARCIA, demands that, pursuant to Wisconsin law, Defendants COUNTY OF SAUK and SAUK COUNTY DISTRICT ATTORNEY be found liable for any

judgment plaintiff obtains against Defendants SPOENTGEN and HOFFMAN, as well as attorney's fees and costs awarded, and for any additional relief this Court deems just and proper.

### COUNT VIII -- STATE LAW CLAIM
### INDEMNIFICATION
### VILLAGE OF LAKE DELTON

165. Each paragraph of this Complaint is incorporated as if restated fully herein.

166. At all relevant times, VILLAGE OF LAKE DELTON was the employer of Defendants POSEWITZ and KILLICK.

167. Defendants POSEWITZ and KILLICK committed the acts alleged above under color of law and in the scope of their employment as employees of the VILLAGE OF LAKE DELTON.

168. Wisconsin law provides that governmental entities are directed to pay any tort judgment for any damages for which employees are liable within the scope of their employment activities.

WHEREFORE, should Defendants POSEWITZ and/or KILLICK be found liable on one or more of the claims set forth above, the Plaintiff, JOSE GARCIA, demands that, pursuant to Wisconsin law, Defendant VILLAGE OF LAKE DELTON be found liable for any judgment plaintiff obtains against Defendant POSEWITZ and/or KILLICK, as well as attorney's fees and costs awarded, and for any additional relief this Court deems just and proper.

## JURY DEMAND

Plaintiff, JOSE GARCIA, hereby demands a trial by jury pursuant to Federal

Rule of Civil Procedure 38(b) on all issues so triable.

**DATED:**   October 28, 2020

Respectfully submitted,

By:   /s/ Jordan Marsh
Attorney for Plaintiff

**Law Office of Jordan Marsh**
5250 Old Orchard Road Suite 300
Skokie IL 60077
(312) 401-5510
jordan@jmarshlaw.com