UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

_____

JOSE GARCIA,

                Plaintiff,                        CASE NO. 20-CV-988

v.

VILLAGE OF LAKE DELTON,
SHAWN POSEWITZ, LUCAS KILLICK,
RICK SPOENTGEN, and LINDA HOFFMAN,

                Defendants.

_____

**VILLAGE OF LAKE DELTON, SHAWN POSEWITZ AND LUCAS KILLICK'S
BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

_____

Village of Lake Delton, Shawn Posewitz and Lucas Killick (collectively, "Village Defendants"), by their attorneys, MUNICIPAL LAW & LITIGATION GROUP, S.C., respectfully submit the following Brief in Support of their Motion for Summary Judgment.

## FACTS

### A.      Report of a Child Sexual Assault.

On August 23, 2016, the dispatch center at the Village of Lake Delton Police Department ("LDPD") received a phone call regarding a child sexual assault. (Village Defendants' Proposed Findings of Fact, "PFOF" 1.) LDPD Officer Troy Spencer spoke with the complainant, Monique Cichocki. (PFOF 2.) Monique reported that Jose Garcia ("Plaintiff") sexually assaulted her 15-year-old daughter ("G.C.") on August 18, 2016, while her family was vacationing with Plaintiff's family at the Wilderness Resort-Glacier Canyon Lodge ("Resort"). (PFOF 3.)

Monique explained that her family and Plaintiff's family stayed at the Resort from August 15, 2016 to August 19, 2016, and that they shared a hotel suite during the vacation.

1

(PFOF 4.)  Monique then reported that G.C. told her Plaintiff innapropriately touched her (G.C.) breasts and vagina-area while they were in the pool.  (PFOF 5.)  Monique also indicated that Plaintiff is a police officer for the City of Chicago Police Department.  (PFOF 6.)

**B.      Video/Audio Recorded Interview of G.C.**

LDPD Detective Shawn Posewitz was assigned to investigate the sexual assault and conducted an audio/video recorded interview of G.C. on August 25, 2016.  (PFOF 7.)  Detective Posewitz told G.C. the interview would be video/audio recorded and G.C. stated she was "comfortable" with the same.  (PFOF 8.)  Detective Posewitz also confirmed G.C. understood the difference between the truth and a lie, and that it was "important to tell the truth."  (PFOF 9.)

During the interview, G.C. told Detective Posewitz that she was in the pool area with her siblings, Plaintiff, and Plaintiff's family when she was sexually assaulted on August 18, 2016. (PFOF 10.)  G.C. explained that her parents were not present at the time because they had already returned to the hotel suite.  (PFOF 11.)  G.C. told Detective Posewitz that Plaintiff approached her from behind and grabbed her breasts for two minutes while they were in the pool.  (PFOF 12.)  She indicated the sexual assault happened "by the lifeguard … by like the slides and everything."  (PFOF 13.)

G.C. also told Detective Posewitz that Plaintiff approached her on a second occasion, asked her to "come over here and sit on [his] lap," and "pulled [her] on his lap in the water." (PFOF 14.)  And, that Plaintiff then touched her vagina-area for two minutes.  (PFOF 15.) During the interview, G.C. confirmed she never gave Plaintiff consent to touch her breasts or vagina-area.  (PFOF 16.)

G.C. then told Detective Posewitz that Plaintiff reapproached her after she exited the pool and asked her to "pinky swear" not to tell anyone about the sexual assault. (PFOF 17.) G.C. indicated that everyone then returned to the hotel suite. (PFOF 18.)

G.C. told Detective Posewitz that she went on the balcony with her mother (Monique) when she returned to the hotel suite and started reporting the sexual assault to Monique. (PFOF 19.) G.C. told Detective Posewitz that Plaintiff kept "eyeballing" her at that time "like he was trying to get [her] attention or something." (PFOF 20.) G.C. told Detective Posewitz that she then stopped reporting the sexual assault to Monique because Plaintiff came outside on the balcony, stood behind Monique, and tried to get G.C.'s attention. (PFOF 21.)

G.C. then described to Detective Posewitz what happened over the next several hours, including that her parents, her siblings, Plaintiff, and Plaintiff's wife went back to the pool later that evening while she stayed back in the hotel suite with Plaintiff's daughters. (PFOF 22.) G.C. told Detective Posewitz that Plaintiff returned to the hotel suite by himself shortly thereafter and stated the following to her:

> [Plaintiff] said 'was that uncomfortable for you?' and 'I really like you,' and 'are you okay with me doing that?' and I was like, 'no, I'm not okay with you doing that. That's not cool…. And he asked me those questions and I was like, 'No, I'm not – that was not cool of you to do that to me.' And he was like, 'I really like you though,' and I'm like, 'Yeah, but that's so wrong. Don't do that to me ever again.'

(PFOF 23.)

G.C. told Detective Posewitz that Plaintiff then attempted to hug her, and that her parents walked into the hotel suite at around that time. (PFOF 24.) G.C. told Detective Posewitz that Plaintiff was startled by her parents, and that he immediately "ran off of [her] to like make sure that [her parents] didn't see what was happening." (PFOF 25.) G.C. told Detective Posewitz that Plaintiff claimed he returned to the hotel suite to use the restroom, but that she never saw Plaintiff use the restroom and believes he "didn't really have to [use the restroom] because [] he

was [instead simply] coming [back to the hotel suite] to talk to [her]." (PFOF 26.) G.C. explained that she then (in private) told Monique that Plaintiff had also touched her "down there." (PFOF 27.)

G.C. told Detective Posewitz that she slept in Monique's bedroom the night of the sexual assault because she was "very scared" of Plaintiff. (PFOF 28.)

Detective Posewitz found G.C. to be credible during the interview based on his law enforcement training, and based on his experience conducting hundreds of sexual assault investigations. (PFOF 29.)

### C.    Video/Audio Recorded Interview of Monique.

Detective Posewitz also conducted and audio/video recorded interview of Monique on August 25, 2016. (PFOF 30-31.) During the interview, Monique confirmed she was not present when G.C. was sexually assaulted in the pool areas because she had already returned to the hotel suite. (PFOF 32.) Monique told Detective Posewitz that G.C. started telling her about the sexual assault while they were outside on the balcony, but that G.C. stopped shortly thereafter because Plaintiff came outside on the balcony like he was "trying to see if [G.C.] was telling [Monique]" about the sexual assault. (PFOF 33.)

During the interview, Monique confirmed that most of the family members went to the pool later that evening while G.C. stayed back in the hotel suite. (PFOF 34.) Monique indicated that she rode the elevator down to the first floor while they were headed to the pool, and that Plaintiff walked down the stairs with the children. PFOF 35.) Monique told Detective Posewitz that, when the elevator door opened on the first floor, G.C.'s brother told her that Plaintiff went back up to the hotel suite to use the restroom. (PFOF 36.)

Monique indicated that she then rushed back to the hotel suite. (PFOF 37.) Monique told Detective Posewitz that Plaintiff was speaking with G.C. when she entered the hotel suite, and that she noticed a startled look on Plaintiff's face at that time. (PFOF 38.) Monique reported that G.C. told her the following (in private) before she left the hotel suite:

> [G.C.'s] like, [Plaintiff] didn't have to go to the bathroom. Do you know he touched me down there? And I was like, 'Oh, God. I didn't know that part.' I'm like 'Okay, [G.C.], relax. I'm going to get him out of this room. We'll be back. We'll talk later.' [G.C.] said, 'Okay.' I said, 'Cause I don't want [Jose] to suspect anything.'

(PFOF 39.)

During the interview, Monique told Detective Posewitz that Plaintiff was acting "stranger than normal" the evening of the sexual assault, "like blasting the radio, which he never does and it was just kind of like – he was trying to attract attention to himself…. Like, he's usually the first one telling us we're making too much noise…." (PFOF 40.)

Monique told Detective Posewitz that Plaintiff was also acting suspicious the following day. (PFOF 41.) Monique reported that both families went to the waterpark that day, and that she sat with G.C. near the outdoor pool. (PFOF 42.) Monique told Detective Posewitz that she noticed Plaintiff watching her and G.C. "like a hawk" that day, and that Plaintiff repeatedly approached her and G.C. to ask about his daughter's whereabouts—even after Monique denied knowledge of the same. (PFOF 43.) Monique told Detective Posewitz that she believes Plaintiff continued approaching them to determine if G.C. was reporting the sexual assault and/or to prevent G.C. from doing the same. (PFOF 44.)

Monique told Detective Posewitz that Plaintiff continued acting suspicious after she left the outdoor pool area and went inside with G.C. (PFOF 45.) Monique indicated that Plaintiff followed them inside, kept approaching them, and remained close to them. (PFOF 46.) Monique told Detective Posewitz that Plaintiff also moved everyone's personal belongings

inside because he claimed it was raining. (PFOF 47.) Monique told Detective Posewitz it was not raining outside and indicated that she believes Plaintiff was instead simply trying to stay close to G.C. (to monitor her while she was inside). (PFOF 48.)

During the interview, Monique indicated that G.C.'s brother also noticed Plaintiff acting suspicious during the vacation. (PFOF 49.) Monique told Detective Posewitz that G.C.'s brother saw Plaintiff and G.C. "pinky swear" before they left the pool area the day of the sexual assault. (PFOF 50.) Monique also told Detective Posewitz that G.C.'s brother noticed Plaintiff staring at G.C. while G.C. was outside on the balcony with Monique. (PFOF 51.) Monique also told Detective Posewitz that G.C.'s brother told Plaintiff there was a public restroom nearby (on the first floor) while they were headed to the pool the evening of the sexual assault, and that Plaintiff nevertheless returned to the hotel suite (up four flights of stairs) to use the restroom. (PFOF 52.)

### D. Criminal Complaint & Arrest Warrant.

On August 26, 2016, Detective Posewitz met with the security director of the Resort and reviewed the surveillance footage of the pool area where the sexual assault occurred. (PFOF 53.) The security director told Detective Posewitz that no lifeguards reported or submitted any type of incident reports regarding a sexual assault. (PFOF 54.) In reviewing the surveillance video of the pool area, Detective Posewitz could not locate or identify any family members in the footage because it was "grainy" (extremely poor quality), because the cameras were located far away from the area where the sexual assault occurred, and because there were numerous patrons in/around the area. (PFOF 55.)

LDPD then provided the Sauk County District Attorney's Office with Detective Posewitz's entire case file so that it could review the materials and determine whether to bring

criminal charges.  (PFOF 56.)  The following materials were provided to the District Attorney's Office that time:

- The police report summarizing the August 23, 2016 call;
- The video/audio footage of G.C.'s interview and the police report summarizing the same;
- The video/audio footage of Monique's interview and the police report summarizing the same; and
- The Resort surveillance footage and the police report summarizing the same.

(PFOF 57.)

Assistant District Attorney ("ADA") Richard Spoentgen had the authority to determine whether to bring criminal charges against Plaintiff.  (PFOF 58.)  ADA Spoentgen decided to charge Plaintiff with two counts of sexual assault.  (PFOF 59.)  ADA Spoentgen then prepared the criminal complaint and he decided what information to include (and not to include) in the criminal complaint.  (PFOF 60-61.)

ADA Spoentgen testified that, when he prepared the criminal complaint, he was "aware that [the] video footage of the interviews with Monique [] and G.C. were available," that the Resort surveillance footage was available, and that he could have reviewed those materials. (PFOF 62.)  ADA Spoentgen also testified that he knew the police "reports of the interview with Monique [] and [G.C.] were summaries and not verbatim transcripts," and that "the videotape footage from those interviews would be far more inclusive of the statements made by Monique and G.C."  (PFOF 63.)

On October 2, 2016, the District Attorney's Office filed the criminal complaint and requested an arrest warrant.  (PFOF 64.)  On October 3, 2016, Sauk County Court Commissioner Leo Grill determined there was probable cause and signed the arrest warrant.  (PFOF 65.)

On October 4, 2016, Detective Posewitz and LDPD Detective Lucas Killick went to the Chicago Police Department to interview Plaintiff.  (PFOF 66.)  At that time, Plaintiff denied the sexual assault and indicated his attorney advised him not to discuss the matter.  (PFOF 67.)  Plaintiff's interview was audio/video recorded and a copy of the same, along with the related police report, was provided to the District Attorney's Office.  (PFOF 68.)

Detective Posewitz and Detective Killick did not arrest Plaintiff or serve the arrest warrant.  (PFOF 69-70.)  Nor were they present when the arrest occurred.  (PFOF 71.)

### E.     Criminal Proceedings & Continued Investigation.

Plaintiff attended an extradition hearing after he was arrested and then appeared at the Sauk County Jail.  (PFOF 72.)  On October 6, 2016, Plaintiff attended an initial appearance where the court determined there was probable cause for the arrest.  (PFOF 73.)

Plaintiff then attended a preliminary hearing on February 16, 2017 and Detective Posewitz testified during the hearing.  (PFOF 74-75.)  Plaintiff's counsel relied on the police reports, the transcripts of the recorded interview with G.C. and screenshots of the Resort surveillance footage during Detective Posewitz's examination.  (PFOF 76.)  Plaintiff's counsel then argued the arrest lacked probable cause because G.C. was not credible; specifically, because the Resort surveillance footage does not depict two bodies coming in contact for two minutes, and because there were inconsistencies in the statements.  (PFOF 77.)

The court determined there was probable cause during the preliminary hearing and explained as follows:

> At this stage, probable cause is satisfied when there exists a believable or a plausible account of the defendant's commission of a felony.  The role of the Court at this stage is not to weigh the strength of the evidence.  It's not the proper forum to debate and determine the issues of credibility and the weight of the evidence once essential facts as to probability have been established.

> I am satisfied that the facts set forth here from Detective Posewitz's testimony, together with the reasonable inferences that can be drawn from those facts, do support probable cause to believe that a felony has been committed by the defendant, so the Court does bind the defendant over for trial.

(PFOF 78.)

Detective Posewitz then conducted the following additional investigation at the direction of ADA Linda Hoffman, the prosecutor who was assigned to the criminal case:

On October 10, 2016, Detective Posewitz asked Detective Killick to review the Resort surveillance footage with G.C. and her family. (PFOF 79.) G.C. made the following observations at that time:

> I then showed them the other surveillance video labeled, "Child Slide Act, Area." While watching the area, [G.C.] told me that this area was where 'it happened.' I asked [G.C.] to explain what she meant by her statement, 'it happened' [G.C.] stated that she was touched by JOSE. I asked [G.C.] if she could point to the area where it happened on the screen. [G.C.] pointed to the area on the video just above the 'ch' in the title/label of the video. [G.C.] stated that she was facing towards a wall and remembered seeing a lifeguard watching the pool area just to her right….
>
> 18:57:18 – [G.C.] stated that at this time she believes this is when she was assaulted as she saw two subjects in the same area where she remembered the incident taking place. [G.C.] stated that it was only them and JOSE was throwing her into the water when she was 'touched.' [G.C.] pointed to the area of the camera just above the 'ch' in the camera label. Due to the video quality, [G.C] was not able to tell with 100% certainty if that was them.

(PFOF 80.) This information was included in a police report and provided to the District Attorney's Office. (PFOF 80.)

On October 10, 2016, Detective Posewitz conducted a video/audio recorded interview with G.C.'s father and G.C.'s brother. (PFOF 81.) A copy of the video/audio footage and the related police report were provided to the District Attorney's Office. (PFOF 81.)

On November 28, 2016, Detective Posewitz obtained additional surveillance footage from the Resort. (PFOF 82.) A copy of the surveillance footage and the related police report were provided to the District Attorney's Office. (PFOF 82.)

On March 29, 2017, Detective Posewitz was asked to obtain a sheet of paper that Monique referenced during her interview. (PFOF 83.) The contents and/or information included in that sheet of paper are unknown. (PFOF 84.) Detective Posewitz was unable to obtain that sheet of paper and notified the District Attorney's Office the same on April 11, 2017. (PFOF 85.)

On December 19, 2017, Detective Posewitz conducted a follow-up video/audio recorded interview with G.C. and Monique. (PFOF 86.) A copy of the video/audio footage and the related police reports were provided to the District Attorney's Office. (PFOF 86.)

On August 6, 2018, Detective Posewitz met with the Resort's Aquatic Director. (PFOF 87.) The Aquatics Director indicated there were 24 lifeguards, 11 ride attendants, and 2 supervisors working in the waterparks on August 18, 2016. (PFOF 88.) He also explained that lifeguards rotate positions every 30 to 45 minutes, that their locations/positions (after their initial rotations) are not documented or assigned, and that:

> Lifeguards are trained to look for signs of distress in the water [and] guests who are attempting to dive into the pool. The lifeguards are not trained to look for signs that a sexual assault may be taking place…. The lifeguards' duty is to scan the entire pool area within a 10 second time frame, from one side of the pool to the[] other, then back to the point where the scan occurred.

(PFOF 89.) A copy of the related police report was provided to the District Attorney's Office. (PFOF 89.)

On April 8, 2018, Detective Posewitz conducted a follow-up video/audio recorded interview with G.C.'s brother. (PFOF 90.) A copy of the video/audio footage and the related police report were provided to the District Attorney's Office. (PFOF 90.)

On April 10, 2018, Plaintiff's attorney requested a photograph that G.C. e-mailed Detective Posewitz during the criminal proceedings (where G.C. circled the location of the

assault). (PFOF 91.) Detective Posewitz sent that e-mail and photograph to the District Attorney's Office on April 10, 2018. (PFOF 92.)

Plaintiff then filed Motion to Dismiss Based Upon the State's Failure to Preserve Exculpatory Evidence. (PFOF 93.) Therein, he argued that Detective Posewitz withheld the photograph noted above, failed to "include any mention of a lifeguard" in his police reports, and failed to interview an unknown lifeguard who was standing near the area where the assault occurred. (PFOF 94.) The court denied the motion. (PFOF 94.)

**F.    Criminal Trial & Dismissal of Charges.**

Although the criminal trial began on April 24, 2018, the court declared a mistrial after both parties presented opening statements because ADA Hoffman discussed G.C.'s cognitive limitations during her opening statement. (PFOF 95.)

ADA Hoffman left the District Attorney's Office shortly after the mistrial to pursue other career opportunities and the criminal case was then handled by DA Kevin Calkins. (PFOF 96.) ADA Hoffman testified that she reviewed all video/audio footage of the interviews, all surveillance footage from the Resort, and all police reports during the criminal proceedings. (PFOF 97.) ADA Hoffman testified that, based on her review of the materials and assessment of the witness' credibility, she "believed that this assault occurred" and "if [she] still had the case, [she] would have pursued a new trial." (PFOF 98.)

On October 1, 2018, DA Calkins filed a motion to dismiss the criminal charges because DA Calkins did not believe he would "be able to present sufficient credible evidence at trial to prove the charged offenses." (PFOF 99) ("This is not an issue of a case they don't think it happened, it's an issue of a case that they don't think they can prove."). DA Calkins made that decision based on his judgment and discretion. (PFOF 100.)

## **STANDARD OF REVIEW**

Summary judgment is proper if the pleadings, depositions, interrogatories, admissions, and affidavits establish that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party has the initial burden of demonstrating the same. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is outcome determinative of an issue with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the initial burden is met, the opposing party must then go beyond the pleadings and designate which material facts are genuinely disputed. *Anderson*, 477 U.S. at 248. The mere existence of some alleged factual disputes will not defeat a properly supported summary judgment motion. *Id*.

## **ARGUMENT**

Plaintiff in this case alleges the following federal claims: Fourth Amendment false arrest (Count I); Fourth and Fourteenth Amendment unlawful detention (Count II); Fourteenth Amendment due process (Count III); and failure to intervene (County IV). He also alleges the following state law claims: malicious prosecution (Count V); and intentional infliction of emotional distress (Count VI).[1]

## I. THE FOURTH AMENDMENT FALSE ARREST CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW.

Plaintiff alleges Detective Killick and Detective Posewitz "caused [him] to be arrested without probable cause [] in violation of the Fourth Amendment." (Dk. 1, Com., ¶ 134.) For the reasons explained below, the Court should dismiss all such claims as a matter of law.

***First***, all false arrest claims alleged against Detective Killick and Detective Posewitz should be dismissed because they were not personally involved in the arrest.

---

[1] Plaintiff also alleges a non-substantive state law claim for indemnification against the Village.

An "individual cannot be held liable in a § 1983 action unless she caused or participated in an alleged constitutional deprivation." *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983); *Morfin v. City of East Chicago*, 349 F.3d 989, 1000 (7th Cir. 2003) (officer who simply transported arrestee could not be held liable for false arrest).

Here, ADA Spoentgen testified that *he* made the decision to initiate the criminal proceedings and bring criminal charges, that *he* prepared the criminal complaint, and that *he* requested the arrest warrant. Those decisions were based on ADA Spoentgen's review of the materials, and on ADA Spoentgen's prosecutorial discretion.

It is also undisputed that Detective Killick and Detective Posewitz simply interviewed Plaintiff. They did not make the arrest and were not present during the arrest. (Reginato Aff., Ex. 3, Hoffman Depo., p. 90:10-16.) Because Detective Killick and Detective Posewitz were not personally involved in the arrest, they cannot be held constitutionally liable for the same.

***Second***, even assuming Detective Killick and/or Detective Posewitz made the arrest, all false arrest claims alleged against them should be dismissed because there was a valid arrest warrant.

It is undisputed that Sauk County Circuit Court Commissioner Leo Grill determined there was probable cause for the arrest and signed the arrest warrant on October 3, 2016—before the arrest was made. Plaintiff may argue the arrest warrant was invalid because Detective Posewitz omitted certain information and failed to note certain *purported* inconsistencies between G.C. and Monique's interviews in his police reports. As a fundamental matter, any such argument is unavailing because the District Attorney's Office was provided with the audio/video recordings of those interviews, which would have allowed the District Attorney's Office to determine

whether certain information might have been missing, or whether there might be certain *purported* inconsistencies that should be noted in the criminal complaint.

More importantly, any omitted information and *purported* inconsistencies were insignificant because they would not have impacted the probable cause determination. As explained below, probable cause existed based on the information G.C. (and Monique) reported during their interview. *See Franks v. Delaware*, 438 U.S. 154, 155 (1978) (an omission of fact in a criminal complaint is material only if the information was of such significance that its absence could reasonable have affected the finding of probable cause); *Stora v. Brady*, 2014 WL 2155368 (D. N.J. 2014) ("While additional or conflicting evidence may have been available, in light of the statement of the alleged victim or witness, plaintiff has failed to allege facts demonstrating the absence of probable cause…. To the contrary, by acknowledging that Nurse Brady told the officers that she was assaulted, plaintiff has affirmatively stated that the officers had probable cause."); *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998) ("The alleged discrepancies between [the victim's] original description of her attacker and [the plaintiff's] appearance on the evening of his arrest do not affect our inquiry into whether [the officer's] actions were objectively reasonable."); *King v. Grams*, 2006 WL 1598679 (E.D. Wis. 2006) (The court recognized "it is not unexpected that one person's memory might not be perfect in every detail, but such discrepancies do not necessarily mean that the witnesses committed perjury or that the prosecutor knowingly made false remarks.").

Tellingly, the criminal court even determined there was probable cause during the preliminary hearing—after it considered similar arguments from Plaintiff relating to omitted information and *purported* inconsistencies.

**Third**, all false arrest claims alleged against Detective Killick and Detective Posewitz should be dismissed because there was probable cause to arrest Plaintiff for sexual assault under Wis. Stats. §§ 948.02(2), 939.50(3)(c).

A police officer has probable cause to arrest a suspect when the facts and circumstances known at the time support a belief that the suspect committed a crime. *Wagner v. Washington Cnty.*, 493 F.3d 836 (7th Cir. 2007). Although probable cause requires more than a bare suspicion of criminal activity, it does not require proof beyond a reasonable doubt or even evidence sufficient to support a conviction. *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000). To determine if probable cause existed, a "court must consider the facts as they reasonably appeared to the arresting officer, seeing what he saw, hearing what he heard, and so forth." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). An officer may exercise common sense and draw upon his training and experience in evaluating the totality of the circumstances confronting him, and a court must make allowance for such judgments in deciding what the officer reasonably might have concluded about the facts. *Id.* "If the officer had probable cause to believe that the person he arrested was involved in criminal activity, then [a] false arrest [claim] is foreclosed." *Id.* at 680.

The Seventh Circuit has repeatedly held that, in making a "decision to arrest someone for criminal conduct that [an officer] did not witness, *a police officer may rely on information provided to him by the victim or by an eyewitness to the crime that the officer reasonably believes is telling the truth*." *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998) (emphasis added). "***So long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest***." *Id.* (emphasis added).

Courts have also held that officers have no constitutional duty to continue an investigation "once probable cause has been established *via* the accusation of a credible witness. They may simply arrest the accused suspect." *Mustafa v. City of Chicago*, 442 F.3d 544 (7th Cir. 2006); *Pasiewicz v. Lake Cnty. Forest Preserve Dist.*, 270 F.3d 520, 524 (7th Cir. 2001) (probable cause exists when there is no indication the witness was lying); *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir. 1994) (same); *Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 2000) ("The inquiry is whether an officer has reasonable grounds on which to act, not whether it was reasonable to conduct further investigation."); *Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988) ("[T]he law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage.").[2]

For example, in *Spiegel v. Cortese*, the victim reported the suspect struck him and showed officers a bruise on his body. *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999). The suspect was arrested and sued the officers for false arrest. *Id.* The suspect argued the officers lacked probable because there were inconsistencies and contradictions in the information the suspect reported, and because further investigation would have revealed the suspect was simply retaliating. *Id.* The court rejected those arguments, dismissed the false arrest claims, and explained the following standards that govern the determination of probable cause:

> ***[No] clearly established precedent required [the officers] to resolve these inconsistencies before arresting [the suspect].*** Of course, it is true that where 'information from or about a [putative] victim of crime would lead a reasonable officer to be suspicious,' the officer should conduct further investigation. But police officers need not exclude every suggestion that a victim is not telling the truth. Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established. Consequently, 'the law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage.' Accordingly, '[t]he inquiry is whether an officer has reasonable grounds on which to act, not whether it was reasonable to conduct further investigation.' ***Nothing suggests that a victim's report must be unfailingly consistent to provide probable cause. The credibility of a putative victim or witness is a question, not***

---

[2] Plaintiff, who is employed as a police officer, testified that he understands the same.

> *for police officers in the discharge of their considerable duties, but for the jury in a criminal trial.*

*Id.* at 724–25.

The court in *Spiegel* also held the officers had no duty to interview witnesses who may have cast doubt on the information the victim reported, or to use "best policing practices" to conduct an investigation. *Id.* at 725. It explained that:

> [T]he police need not automatically interview available witnesses, on pain of the risk that a jury will require them to pay damages. Good police practice may require interviews, but the Constitution does not require police to follow the best recommended practices. There is a gap, often a wide one, between the wise and the compulsory. To collapse those two concepts is to put the judicial branch in general superintendence of the daily operation of government, which neither the fourth amendment nor any other part of the Constitution contemplates.

*Id.*[3]

Here, it is undisputed that Detective Posewitz interviewed G.C. before the arrest, and that G.C. reported the following at that time:

- G.C. understood the difference between the truth and a lie, and understood it was important to be truthful.

---

[3] Notably, courts have routinely dismissed false arrest claims as a matter of law in cases with facts and circumstances similar to those in the present case. *See Dowd v. City of New Richmond*, 128 Wis. 2d 558, 384 N.W.2d 366 (Ct. App. 1986).(Explaining that, in sexual assault cases, the statement of the victim is often the only evidence needed to establish probable cause for an arrest.); *Forest v. Pawtucket Police Dpt.*, 290 F. Supp. 2d 2015 (D. Rhode Island, 2003) (Dismissing false arrest claim as a matter of law where 15 year old boy reported being touched innappropriately and where officer only interviewed victim and victim's mother prior to arrest, and indicating that: "the police may rely on a victim's information or positive identification to establish probable cause to arrest absent some reason to doubt the victim's reliability;" "when information comes from a victim or witness rather than an interested informant, there is a presumption that such information carries an indica of reliability;" "permitting police officers to rely on a victim's apparent credible statement to determine probable cause is crucial, even when the victim's version is ultimately proven unreliable;" and "the mere fact further investigation might have revealed contrary conclusion is not enough to make the officer's conduct unreasonable."); *Mutter v. Town of Salem*, 945 F. Supp. 402 (D.N.H. 1996) (Dismissing false arrest claim where officer relied on victim's report of sexual assault to make the arrest.); *White v. Town of Marblehead*, 989 F. Supp. 345 (D. Mass. 1997) (Dismissing false arrest claim where victim reported sexual assault even though officer did not interview anyone else who was present at the time, and explaining that "a coherent and dangerous narrative" is enough to establish probable cause."); *Barham v. Town of Greybull Wyoming*, 483 Fed. Appx 506 (10th Cir. 2012) (Dismissing false arrest claim where officers relied solely on statement made by a minor victim, even though victim failed to mention certain key details during interview, including that the suspect had a lower leg prosthesis, and even though officers failed to ask victim significant questions about suspect's prosthesis and inability to ejaculate.)

- G.C. reported that Plaintiff innapropriately touched her breasts and vagina-area on August 18, 2016. G.C. reported this occurred while they were in a pool at the Resort and indicated she never gave Plaintiff consent.

- G.C. reported that Plaintiff approached her after she exited the pool and told her "[d]on't tell anyone I did that, and pinky swear it, don't tell anyone." G.C. reported that she pinky swore with Plaintiff at that time.

- G.C. reported that, after she returned to the hotel suite, she went on the balcony and started telling Monique about the assault. G.C. reported that Plaintiff was staring at her while she was on the balcony. G.C. also reported that Plaintiff came out on the balcony, stood behind Monique, and kept trying to get her attention.

- G.C. reported that, a few hours later, Plaintiff returned to the hotel suite – where G.C. was located without any adult supervision – to purportedly "use the restroom" and said the following at that time: "was that uncomfortable for you," "I really like you and are you okay with me doing that." G.C. reported that Plaintiff also hugged her at that time. G.C. also reported that Monique then walked in the hotel suite, and that Plaintiff "had to get away from her" at that time so Monique would not see what was happening. G.C. reported that she never saw Plaintiff use the restroom when he returned to the hotel suite.

- G.C. reported that she "was afraid that night [of the sexual assault] so she slept in her parent's bedroom." G.C. also reported that, since the sexual assault occurred, "every night, I'm shaking in my bed, like is [Plaintiff] gonna come here, or like, is he gonna knock at the door and be like I'm gonna sue you."

It is undisputed that Detective Posewitz found G.C. to be credible based on his law enforcement training, and based on his experience conducting hundreds of sexual assault investigations. This information alone – reported by "the victim [] to the crime that [Detective Posewitz] reasonably believe[d] [was] telling the truth" – provided probable cause for the arrest as a matter of law.

It is also undisputed that Detective Posewitz interviewed Monique before the arrest, and that Monique reported the following at that time:

- Monique reported that G.C. was crying while she was outside on the balcony informing her about the assault. Monique also confirmed that Plaintiff came out on the balcony to prevent G.C. from reporting the assault. Monique reported that G.C.'s brother also observed Plaintiff

staring at them (Monique and G.C.) while they were out on the balcony discussing the assault.

- Monique reported that G.C.'s brother observed Plaintiff and G.C. "pinky swear" while they were at the pool on August 18, 2016.

- Monique reported that, shortly after all the adults left the hotel that evening, Plaintiff rushed back up four flights of stairs and returned to the hotel suite – where G.C. was located without any adult supervision – to purportedly use the restroom. Monique also reported that G.C.'s brother told Plaintiff there was a restroom located nearby on the first floor, and that Plaintiff still ran up four flights of stairs and went back to the hotel suite.

- Monique reported that, after she rushed back to the hotel suite and opened the door, she observed Plaintiff speaking with G.C. alone. Monique also reported that she observed an "oh my god" look on Plaintiff's face at that time.

- Monique confirmed that she spoke with G.C. (in private) briefly after she returned to the hotel suite, and that G.C. indicated the following at that time: "[G.C.'s] like, [Plaintiff] didn't have to go to the bathroom. Do you know he touched me down there? And I was like, 'Oh, God. I didn't know that part.' I'm like 'Okay, [G.C.], relax. I'm going to get him out of this room. We'll be back. We'll talk later.' [G.C.] said, 'Okay.' I said, 'Cause I don't want [Jose] to suspect anything.'"

- Monique reported that Plaintiff acted unusual the evening of the assault by "blasting the radio, which he never does and it was just kind of like – he was trying to attract attention to himself…. Like, he's usually the first one telling us we're making too much noise…."

- Monique reported that Plaintiff acted suspicious the day after the assault when the families went to the pool. Monique reported that Plaintiff watched her and G.C. "like a hawk" and repeatedly approach them to determine if they were discussing the assault. Monique reported that, "everywhere they went, [she] would look and there would be [Plaintiff]." Monique also reported that Plaintiff moved everyone's belonging indoors (close to the area where G.C. was playing) because he claimed it was raining, even though it was not raining. Monique indicated that Plaintiff moved their belongings inside to continue monitoring G.C.

- Monique reported that G.C. became withdrawn and very quiet after the assault.

**Fourth**, all false arrest claims alleged against Detective Killick and Detective Posewitz should be dismissed because – at a minimum – there was arguable probable cause for the arrest.

Courts have held that officers are provided with "a degree of latitude to make mistakes or misjudgments. Thus, where a section 1983 action rests on a claim of false arrest, the qualified immunity standard is satisfied 'so long as the presence of probable cause is at least arguable." *Fraser v. Massachusetts Bay Transportation Auth*., 2021 WL 2458203, at *8 (D. Mass. June 16, 2021); *Leaver v. Shortess*, 844 F.3d 665, 670 (7th Cir. 2016) (Qualified immunity "tolerates reasonable mistakes regarding probable cause" and precludes liability if "it would not have been clear to a reasonable officer that the information" at issue would have negated probable cause.).

For example, in *Fraser*, the court dismissed a false arrest claim at the pleadings stage based on arguable probable cause. *Id.*, * 8-9. There, a woman told officers plaintiff "rubbed his penis against her buttocks" and "when she confronted him[,] he smiled at her and then attempted to leave the station." *Id.*, *2. Plaintiff alleged the officers arrested him "without further inquiry or discussion with [him], without any attempt for corroboration by any of several witnesses— including MBTA bus driver and staff who were present at the time of the incident—and without any scene investigation whatsoever." *Id.*, *3. The court dismissed the claims because it was not "obvious, even accepting the allegations of the complaint as true, that [the woman] was not credible, or that there were serious questions concerning her credibility. She described an assault by an individual who then got on the bus, and gave a description of that individual; plaintiff, in fact, matched the description and was on the bus in question. Nothing about those circumstances would have caused a reasonably prudent officer to conclude that she was fabricating the accusation." *Id.*

The court in *Fraser* also held that dismissal was warranted even though the officers did not conduct an investigation, including interviewing witnesses (the bus driver) and reviewing the surveillance footage (from the bus). *Id.* The court recognized the difficult nature of making

decisions regarding whether to arrest suspects based on a reported sexual assault and emphasized those decisions are protected by the doctrine of arguable probable cause—even if they turn out to be incorrect:

> It is also noteworthy that this incident was perhaps more fraught with complexity than a typical arrest. Arguably, the officers should have been more skeptical of the report of an alleged victim of sexual assault, and demanded additional proof. But law enforcement has been under substantial criticism—often justified—for not sufficiently crediting the complaints of such victims.

> As a result of giving her testimony credence, they made an arrest. Unfortunately, they arrested a man who was shown relatively quickly to be innocent. And law enforcement has also been under substantial criticism—again, often justified—for unduly aggressive enforcement actions against minority populations. That does not, of course, mean that these officers made the correct decision—obviously, they did not—but it helps to underscore the difficult nature of the decisions such officers are routinely required to make.

> In any event, it is not necessary to find that the officers got it right. One of the purposes of qualified immunity is to provide a reasonable degree of protection for officers to make certain kinds of mistakes. The question, therefore, is not whether they might have made a better choice. Rather, it is whether their actions were not even 'arguabl[y]' supported by probable cause. Under that standard, they are clearly protected by qualified immunity.

*Id.*; *see Tangwall*, 135 F.3d 510 (Dismissing false arret claim based on arguable probable cause even though officer relied solely on a statement from the victim of sexual assault, and even though the victim's statement regarding the suspect's appearance was inconsistent because "the factual bases underlying probable cause and [] qualified immunity remain undisputed; namely, that [the victim] positively and unequivocally identified [the suspect] as her attacker to the Detective's fellow officers in the restaurant on the night of the apprehension, that the identification was promptly related to [defendant], and that he arrested [the suspect] in good-faith reliance on this information.").

In this case – at a minimum – there was arguable probable cause for the arrest based on the information G.C. and Monique reported during their interviews. There was no indication that G.C. or Monique were being untruthful and it is undisputed Detective Posewitz found them to be

credible based on his law enforcement training, and based on his experience conducting hundreds of sexual assault investigation. ADA Hoffman also testified that she found G.C. and Monique to be extremely credible, and that G.C. and Monique had no motive whatsoever to lie. (Reginato Aff., Ex. 3, Hoffman Depo., p. 212-213) ("And I think that was very striking that there was just a complete lack of motive by any members of this family to be saying any of the things they were saying.").

## II. THE FOURTH AND FOURTEENTH AMENDMENT UNLAWFUL DETENTION CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW.

Plaintiff alleges Detective Killick and Detective Posewitz "accused [him] of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against [him] without any probable cause for doing so and in spite of the fact that they knew [he] was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments to the U.S. Constitution." (Dkt. 1, Comp., ¶ 142.) For the reasons explained below, the Court should dismiss all such claims as a matter of law.

*First*, all unlawful detention claims alleged against Detective Killick and Detective Posewitz should be dismissed because Plaintiff's allegations are unsupported by the record in this case. There is no evidence that Detective Killick or Detective Posewitz "accused" Plaintiff of criminal activity, or that they "exert[ed] influence to initiate … judicial proceedings." To the contrary, it is undisputed the District Attorney's Office had Detective Posewitz's entire case file before the arrest, which included: the police report summarizing the August 23, 2016 call with Monique; the video/audio footage of G.C.'s interview and related police report; the video/audio footage of Monique's interview and related police report; and the Resort surveillance footage and related police report.

Indeed, ADA Spoentgen testified that *he* made the decision to bring criminal charges, that *he* made the decision to initiate the criminal proceedings, and that *he* made the decision on what information to include in the criminal complaint without consulting Detective Killick or Detective Posewitz:

Q. You charged [Plaintiff], right?

A. Yes.

(Reginato Aff., Ex. 2, Spoentgen Depo., p. 214-215.)

A. I believe it would have been to say, 'Hey, do you think that this is an okay case?' And I could have potentially explained the case facts to ADA Hoffman. I don't -- I don't independently recollect the conversation, though.

Q. So how many -- *how many conversations did you have with anyone about whether or not it was* – the evidence was sufficient to charge?

A. I believe I would have probably had one conversation before drafting the complaint. And then I forwarded a draft copy of the complaint to ADA Hoffman to make some suggested edits – or suggestions for edits, which I then incorporated into the document that was eventually filed. So I think one discussion, but maybe two other person-case-touches, as it were.

Q. So the discussion would have been with Linda Hoffman?

A. I believe so, yes

(Id., p. 193:1-17.)

Q. Okay. Who determined what you would receive as far as case materials?

A. For the initial submission, it's – law enforcement gives us what they give us, so law enforcement.

Q. But it's not their decision as to whether or not to go forward with charges, correct?

A. Correct

(Id., p. 175:1-8.)

The record in this case shows that Detective Killick and Detective Posewitz did not make those decisions, and did not influence those decisions (by withholding information or otherwise). ADA Spoentgen confirmed he was "aware that [the] video footage of the interviews with Monique [] and G.C. were available," he knew the Resort surveillance footage was available, and

he could have relied on those materials to draft the criminal complaint. ADA Spoentgen also acknowledged that the police "reports of the interview with Monique [] and [G.C.] were summaries and not verbatim transcripts," and that "the videotape footage from those interviews would be far more inclusive of the statements" provided by G.C. and Monique.

Nor is there any evidence that Detective Killick or Detective Posewitz "exert[ed] influence to … perpetuate judicial proceedings." ADA Hoffman testified that *she* made the decision to continue with the prosecution, and that *she* made those decisions based on her prosecutorial discretion.

*Second*, all unlawful detention claims alleged against Detective Killick and Detective Posewitz should be dismissed because they never detained Plaintiff. It was the Chicago Police Department who arrested Plaintiff. Detective Killick and Detective Posewitz were not even present during the arrest. Nor were they involved in decisions regarding Plaintiff's incarceration or release from jail. *Tibbs v. City of Chicago*, 469 F.3d 661, 665 (7th Cir. 2006) (arresting officer is not responsible for continuing detention once he turns suspect over to jailers).

*Third*, all unlawful detention claims alleged against Detective Killick and Detective Posewitz should be dismissed even if the Court determines they were involved in the arrest/detention because the information G.C. and Monique reported during their interviews provided probable cause – or, at a minimum, arguable probable cause, to detain and arrest Plaintiff. *See Barfell v. Romanowicz*, 2016 WL 7350857, at *3 (E.D. Wis. Dec. 19, 2016) (unlawful detention claims against officers dismissed where officers had probable cause).

## III. THE FOURTEENTH AMENDMENT DUE PROCESS CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW.

In his written discovery responses, Plaintiff alleges that Detective Killick and Detective Posewitz violated the Fourteenth Amendment by falsifying and/or withholding the following

during the criminal proceedings, despite the fact that none of this information prompted the mistrial, despite the fact that probable cause still existed, and despite the fact that the District Attorney's Office was provided with all such information during the criminal proceedings and nevertheless decided to continue with the prosecution:

1) "[Plaintiff's] multiple denials in his October 4, 2016 interview."

2) "[Plaintiff's] statements in his October 4, 2016 interview."

3) "The fact that Defendant Posewitz was unable to see two bodies together on the surveillance video for two minutes at a time."

4) "G.C.'s statement that the alleged [assault] happened near a lifeguard."

5) "[Detective] Posewitz's half-hearted attempt to obtain information on [the Wilderness Resort's] lifeguards, and his failure to follow up by questioning the aquatics director as directed by Callie Northcott."

6) "The fact that [G.C.'s mother] changed the time of the assault from 5:00 – 5:30 to 6:30 – 7:00 after she could not see anything on the video."

7) "G.C.'s brother's statement to [G.C.'s mother] in [Detective] Posewitz's supplemental report of his interview with [G.C.'s mother], that [Plaintiff] told everyone in the elevator that he had to go to the bathroom, which contradicted [G.C.'s mother's] account that the only ones in the elevator were [Plaintiff] (who ran out), herself, and Anthony."

(Reginato Aff., Ex. 11, P's Res. Irrogs., No. 16, 17.)   In the Complaint, Plaintiff alleges Detective Killick and Detective Posewitz also withheld the following evidence during the criminal proceedings:

8) An e-mail from G.C. that indicated the location of the assault.

9) A sheet of paper that Monique pulled out of her pocket, and that G.C. may have referenced, during their interviews.

(Dkt. 1, Com., p. 27-28.)   For the reasons explained below, the Court should dismiss all such claims as a matter of law.

The Fourteenth Amendment Due Process Clause requires prosecutors to provide criminal defendants with all exculpatory evidence during criminal proceedings.  *Brady v. Maryland*, 373 U.S. 83 (1963).   With respect to police officers, they are required to provide the district

attorney's office (or prosecutor) with all exculpatory evidence during criminal proceedings. *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001).

To establish a constitutional violation, a plaintiff must prove police officers withheld material evidence during the criminal proceeding (by failing to provide it to the district attorney's office), that such evidence was favorable to the plaintiff, and that the plaintiff was prejudiced by the withholding of such evidence. *U.S. v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). "Favorable evidence is material [] if there is a reasonable probability that, had the evidence been disclosed to the [criminal defendant], the result of the [criminal] proceeding would have been different." *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 644 (7th Cir. 2008). A plaintiff in a civil case must demonstrate "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." *Id.*

As an initial matter, all due process claims alleged against Detective Killick should be dismissed because he was not involved in any decisions regarding what evidence to provide the District Attorney's Office.

It is undisputed that Detective Killick did not conduct any interviews, did not prepare any police reports relating to any interviews, and did not determine what information to include in any such police reports. Nor was Detective Killick present when Detective Posewitz reviewed the Resort surveillance footage or involved in preparing the related police report. Detective Killick also never spoke with any Resort employees and never made any decisions regarding the lifeguards. Plaintiff admits there is no evidence to support his claims against Detective Killick:

> INTERROGATORY 18: Identify each and every piece of exculpatory evidence that you claim Killick withheld during the events at issue in this lawsuit.
>
> ANSWER: Unknown at this time. Investigation continues.
>
> INTERROGATORY 18: Identify each and every piece of exculpatory evidence that you claim Killick falsified during the events at issue in this lawsuit.

ANSWER: Unknown at this time. Investigation continues.

(Reginato Aff., Ex. 11, P's Res. Irrogs., No. 18, 19.)

In addition, Plaintiff cannot prove a due process violation with respect to **items 1), 2), 3), 4), 6), 7),** and **8)** above because the information was provided to the District Attorney's Office during the criminal proceedings.

It is undisputed that Plaintiff's interview was audio/video recorded, and that a copy of the recording and related police report was provided to the District Attorney's Office. Plaintiff's statements – including, but not limited to, his "multiple denials" and other "statements" – were produced. It is also undisputed that G.C., Monique, and G.C.'s brother's interviews were audio/video recorded, and that a copy of those recordings and related police reports were provided to the District Attorney's Office. The information G.C., Monique, and G.C.'s brother reported during their interviews – including, but not limited to, the location of the assault, the lifeguard, the timing of the events, and the elevator – was all produced.

In fact, the record proves Plaintiff received the audio/video recorded interviews and even used transcripts of the same during the criminal proceedings. Plaintiff cannot establish a *Brady* violation when he obtained (and even used) the evidence at issue during the criminal proceedings. *See Mosley v. City of Chicago*, 614 F.3d 391, 397 (7th Cir. 2010) (*Brady* claim fails as a matter of law when there is no evidence the officers withheld favorable evidence/information from the criminal defendant); *but see, Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) (*Brady* claim is viable, however, where the district attorney was not provided with law enforcement files that contained exculpatory information).

Nor does the Constitution require officers to include every detail in their written reports. This precise issue was recently addressed in *Jones v. York*, 2021 WL 1614589 (W.D. Wis. 2021),

where the court dismissed a due process claim stemming from the failure to include certain information in a police report. The police officer in that case "did not mention in his report that Jones told him that Onopa had put his hands had put his hands on her throat, while the recording of the interview shows that Jones told York 'he had me by the throat;'" "wrote that Jones called the [police] to report a theft, while in the recording, Jones told York that she called to report *Onopa's behavior* to the [police] the day after the incident;" and "did not memorialize [a call] in a police report." *Id.* The court dismissed the due process claim because there was "no evidence that [the officer] knew what he wrote or omitted writing was false. [T]he Constitution does not demand perfection…. Here, while [the officer's] report was not perfect, his statements or omissions do not amount to a material, constitutional violation." *Id.*

It is also undisputed that a copy of the Resort surveillance footage was provided to the District Attorney's Office. Detective Posewitz did not modify the surveillance footage, withhold any portions of the surveillance footage, or deny whether he (or anyone else based on their review of the security footage) could "see two bodies together on the surveillance video for two minutes at a time." To the contrary, Detective Posewitz testified he could not see two bodies together for two minutes during the preliminary hearing—where the court confirmed there was probable cause for the arrest.

The evidence also shows that Detective Posewitz provided the District Attorney's Office with a copy of G.C.'s e-mail (including the photograph indicating the location of the assault) on April 10, 2018. This occurred immediately after Plaintiff requested a copy of the same. Courts have held the late disclosure of evidence does not amount to a due process violation unless the plaintiff was unable to use such evidence at trial. *See Moore v. Casperson*, 345 F.3d 474, 493 (7th Cir. 2003) (so long as the disclosure is made before it is too late for the defendant to make

use of it at trial, due process is satisfied); *Bielanski*, 550 F.3d at 645 ("[E]vidence can be handed over on the eve of trial or even during trial so long as the defendant is able to use it to his or her advantage."). Plaintiff in this case had the ability to use the e-mail, and any photographs and information included therein, at trial.

Plaintiff also suffered no prejudice because the information included in the e-mail (i.e., the location of the assault) was already known. It is undisputed that G.C. indicated the location of the assault during her interview and when she watched the Resort surveillance footage (October 10, 2016), and that such information was included in the related police report which was provided to the District Attorney's Office. In fact, Plaintiff even discussed the reported location of the assault during the preliminary hearing.

With respect to **item 9)** above, Plaintiff cannot prove a due process violation because Detective Posewitz never reviewed or obtained the sheet of paper. Nor was Detective Posewitz required to request, obtain, or review the sheet of paper. The Constitution does not "place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case." *U.S. v. White*, 970 F.2d 328, 337 (7th Cir. 1992). Nor are officers required to "explore multiple potential inferences to discern whether evidence that is not favorable to a defendant could become favorable." *U.S. v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002) ("This court has held many times that *Brady* does not require the government to gather information or conduct an investigation on the defendant's behalf.").

It is also unknown whether the sheet of paper included any favorable or exculpatory evidence. Plaintiff cannot establish a *Brady* violation by simply speculating about the information included in the sheet of paper. "[M]ere speculation is not sufficient to sustain a *Brady* claim," and "hypothesizing that certain information, had it been disclosed to the defense,

might have led [defense] counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized" is also insufficient to prove a due process violation. *U.S. v. Horton*, 756 F.3d 569, 575 (8th Cir. 2014); *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995).

Courts have addressed this precise issue. In *U.S. v. Mason*, 951 F.3d 567 (D.C. 2020), the court rejected an argument that the failure to disclose a letter amounted to due process violation because it could have included exculpatory evidence. Plaintiff argued that "an earlier disclosure of what the government knew about [a] letter might have provided defense counsel with promising leads. Perhaps, he says, defense counsel would have uncovered cellmates who overheard a conversation [] about the letter had they investigated the matter earlier in 2017. Maybe Walker, had he been interviewed earlier, would have been willing to testify as to what Jazz told him about the letter, instead of pleading the Fifth. Or, defense counsel might have subpoenaed … and monitored [Jazz] … so [that] he never died." *Id.* at 574. The court held "the argument that an earlier disclosure might have led Mason to uncover other promising leads is simply too speculative to undermine our confidence in the outcome of trial." *Id.*

With respect to **item 5)** above, Plaintiff cannot prove a due process violation because Detective Posewitz was not constitutionally required to identify, locate, or interview the unknown lifeguard (or any other lifeguard) during his investigation. The Constitution does not "place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case." *U.S. v. White*, 970 F.2d 328, 337 (7th Cir. 1992).

Plaintiff's argument regarding the unknown lifeguard is also a red herring. Even if the unknown lifeguard was identified and interviewed, and even if the unknown lifeguard indicated he never observed the sexual assault or two bodies together for two minutes – perhaps because

lifeguards are not trained to monitor for sexual assaults, because their attention is not focused on any one particular person for two minutes, or for any other reason – it does not mean the sexual assault never occurred.

The Seventh Circuit recently dismissed a due process claim based on the failure to disclose a police report that indicated an individual who was at the scene of the crime (a police officer) never observed the crime. In *U.S. v. Miller*, 822 Fed. Appx. 484, 487 (7th Cir. 2020), plaintiff argued that "the lack of incriminating evidence is itself exculpatory," and that such evidence was improperly withheld during the criminal proceedings. The lower court dismissed the claim because "***the fact that [the officer] saw nothing that he deemed incriminating [] does not render the information he learned there 'favorable,' which is required to prove a due process violation.***" *Id.* at 488 (emphasis added). The Seventh Circuit upheld the ruling and explained as follows:

> It is notable that the undercover investigation barely overlapped with [the criminal defendant's] sex trafficking activities…. [The detective's] opportunity to observe any alleged trafficking was thus limited at best. Nothing in [the detective's] notes or the audio recordings show that [the criminal defendant] did *not* engage in sex trafficking. In arguing that the absence of incriminating evidence is itself exculpatory, [the plaintiff] assumes that if forced prostitution was occurring there, the undercover investigators would have detected it. But [the plaintiff] provides no reason to believe that [the officer], who only periodically visited the building, was there at the key moments, such as when a 'date' arrived or left…. It also is not evident that the officers were 'looking for evidence of human trafficking,' as [the plaintiff] asserts, or for something else.

*Id.* at 489.

Courts have also held that a due process violation cannot be established if the evidence was available to plaintiff during the criminal proceedings through the exercise of reasonable diligence. *O'Hara*, 301 F.3d at 569; *U.S. v. Ashburn*, 2015 WL 5098607 (E.D. NY 2015) (No due process violation for failing to locate a witness because there was "no proffer of any defense efforts to locate or speak with any of these witnesses," despite the fact that the criminal defense

team included "three attorneys and one private investigator," and noting that "to hold the government responsible for [criminal defendant's] inability to locate these witnesses would effectively require the government to conduct the [criminal defendant's] investigation for him. This is not what *Brady* demands.").

Plaintiff in this case never attempted to identify, locate, or interview the unknown lifeguards during the criminal proceedings. Rather than exercising "reasonable diligence," Plaintiff simply relied on the Aquatics Director's statement that ***some of the lifeguards*** moved away and were no longer available. Notably, some of the lifeguards ***did not move away*** (potentially the unknown lifeguard) and were therefore still available during the criminal proceedings. Nor did Plaintiff attempt to interview any of the 23 other lifeguards (or other employees) who were present on the date of the sexual assault (or other pool employees) to determine where they were positioned during the sexual assault, or to determine if they observed the sexual assault. Plaintiff cannot prove a due process violation by simply speculating that the unknown lifeguard moved away and was no longer available during the criminal proceeding.

The due process claims alleged against Detective Killick and Detective Posewitz should also be dismissed because the criminal charges were dropped, and because Plaintiff did not suffer any prejudice.

Courts have held that, if criminal charges are dropped before trial, a due process claim can only be established if the suppressed evidence would have caused the district attorney to dismiss the charges earlier in the proceedings. *See Bielanski*, 550 F.3d at 664 ("Earlier disclosure of this evidence would not have resulted in dismissal of the charges prior to trial. For the most part, the evidence is impeaching rather than exculpatory and its use in cross-examination of the investigators and the accuser certainly would have created credibility issues

for the trier of fact to resolve.  This evidence weakened parts of the prosecution's case but was not the type of evidence that would have precluded the charges entirely."); *Polzin v. Mutter*, 2012 WL 996599 (E.D. Wis. 2012) ("The operative principle applied by other Circuits in deciding that an acquittal precludes *Brady* violations is that where no harm occurred (i.e., charges were dropped or the defendant was acquitted), it is not possible for a *Brady* claim to be sustained."); *Cairel v. Alderden*, 821 F.3d 823, 831 (7th Cir. 2016) ("Even assuming [] that defendants fabricated evidence, plaintiffs still could not prevail on this claim.  For such a claim, the plaintiff must have suffered a deprivation of liberty.  The need to appear in court and attend trial does not constitute such a deprivation.  We held in *Saunders-El* that a plaintiff who had been released on bond following his arrest and who was later acquitted at trial could not maintain a due process claim for fabrication of evidence.").

Here, there is no evidence that ADA Hoffman would have dropped the criminal charges earlier in the proceedings if she was aware of items 1) through 9) above.  To the contrary, ADA Hoffman testified that she **was aware** of such evidence, and that she nevertheless decided to continue with the criminal prosecution.  ADA Hoffman unmistakably testified she "believed that this assault occurred" even after the court declared a mistrial, and "if [she] still had the case, [she] would have pursued a new trial."

Finally, the due process claims alleged against Detective Killick and Detective Posewitz should be dismissed because they are barred by the doctrine of collateral estoppel.  For example, in *Jones v. New York*, 2021 WL 1614589 (W.D. Wis. 2021), the criminal defendant filed a motion to dismiss the criminal charges based on a failure to disclose exculpatory evidence.  *Id.* The criminal court found the evidence at issue was not exculpatory and determined there was no

bad faith. *Id.* The court in the civil case held that plaintiff could not re-litigate the issue and therefore dismissed the due process claim as a matter of law. *Id.*

Plaintiff in this case also filed a motion to dismiss based on the failure to disclose exculpatory evidence during the criminal proceedings, and criminal court determined there was no due process violation and denied the motion. Consequently, Plaintiff is barred from re-litigating this issue.

For these reasons, the Court should dismiss all Fourteenth Amendment due process claims alleged against Detective Killick and Detective Posewitz as a matter of law.

## IV.  THE FAILURE TO INTERVENE CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW.

Plaintiff alleges "one or more of the Defendants had a reasonable opportunity to prevent the violation of [his] constitutional rights as set forth above, but failed to do so." (Dkt. 1, ¶ 151.) For the reasons explained below, the Court should dismiss all such claims as a matter of law.

***First***, the Complaint is legally deficient because it does not specify who allegedly failed to intervene, or what conduct he/she allegedly failed to intervene in. Plaintiff did not "sufficiently give [] the defendants fair notice of what the … claim is and the grounds upon which it rests," and the failure to intervene claims should therefore be dismissed. *See Bell v. City of Country Club Hills*, 841 F.3d 713, 716 (7th Cir. 2016) (A complaint must also "sufficiently give to the defendants 'fair notice of what the ... claim is and the grounds upon which it rests.'"); *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("The Rules of Civil Procedure set up a system of notice pleading. Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed.").

**Second**, the failure to intervene claims alleged against Detective Killick and Detective Posewitz should be dismissed because Plaintiff cannot establish a constitutional violation (for the reasons explained above). The derivative failure to intervene claims must therefore also be dismissed. *See Leaf v. Shelnutt*, 400 F.3d 1070, 1093 (7th Cir. 2005) (failure to intervene should be dismissed when there was no underlying constitutional violation).

**Third**, the failure to intervene claims alleged against Detective Killick and Detective Posewitz should be dismissed because they did not have a realistic opportunity to intervene, and because they acted reasonably. *See Yang v. Hardin*, 37 U.S. 282 (7th Cir. 1994) (to establish a failure to intervene claim, plaintiff must prove the officer knew the suspect's rights were being violated, had a realistic opportunity to prevent the violation, and failed to take reasonable steps to prevent the violation).

As explained above, it is undisputed that ADA Spoentgen made the decision to bring criminal charges, and that ADA Hoffman made the decision to continue with the criminal prosecution. ADA Spoentgen and ADA Hoffman testified those decisions were based on their own judgment and prosecutorial discretion. Detective Killick and Detective Posewitz did not have the ability (or authority) to prevent the District Attorney's Office from filing or pursuing criminal charges. The record also shows Detective Killick and Detective Posewitz acted reasonably by audio/video recording the interviews, by preparing police reports, and by providing the District Attorney's Office with the same (and all other evidence they obtained during the investigation). The District Attorney's Office had the ability to review and consider all the evidence in making the charging and prosecutorial decisions.

## V.     THE FEDERAL CLAIMS ARE BARRED BY QUALIFIED IMMUNITY.

For the reasons explained below, the federal claims alleged against Detective Killick and Detective Posewitz should also be dismissed as a matter of law on qualified immunity grounds.

Government officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This legal defense is known as qualified immunity and allows for reasonable errors "because officials should not err always on the side of caution [for the] fear of being sued." *Humphrey v. Staszek*, 148 F.3d 719, 727 (7th Cir. 1998). Qualified immunity "erects a substantial barrier for plaintiffs, and appropriately so because qualified immunity is designed to shield from civil liability all but the plainly incompetent or those who knowingly violate the law." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994).

A two-prong test exists to determine if a claim is barred by qualified immunity. A plaintiff must first show the facts are sufficient to prove a constitutional violation. *Rakovich v. Wade*, 850 U.S. 1180, 1209 (1988). A plaintiff must then prove the constitutional right was clearly established before the date of the incident. *Id.* "[L]ower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first" and may dismiss a case on either prong of qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)

For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). The law must provide "fair warning" to officials that the complained-of conduct is unconstitutional. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "Specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1152.

A clearly established right cannot be shown with "high levels of generality." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). A plaintiff must provide "controlling authority" or "a robust consensus of cases of persuasive authority" holding that the conduct at issue is unconstitutional. *Id.* at 2023; *Wood v. Moss*, 134 S.Ct. 2056, 2067 (2014) (constitutional right was not clearly established without analogous prior case law); *Stanton v. Sims*, 134 S.Ct. 3, 145 (2013) (qualified immunity applied where precedent "did not lay down a categorical rule for all cases" and was interpreted "too broadly."). The Supreme Court "has repeatedly told courts … not to define clearly established law at a high level of generality." *City of Escondido, California v. Emmons*, 139 S.Ct. 500, 503 (2019).

The federal claims alleged in this case are barred under the first prong of qualified immunity because, as explained above, Plaintiff cannot establish a constitutional violation. The federal claims are also barred under the second prong of qualified immunity for the following reasons:

*First*, the false arrest and unlawful detention claims are barred by qualified immunity because it was not clearly established that an officer can be held liable when he did not make the decision to arrest the suspect, when he did not prepare the criminal complaint or determine what to include therein, when he did not obtain the arrest warrant, when he did not arrest or detain the suspect, and when he was not even present during the arrest.

Nor was there clearly established law indicating that probable cause does not exist when a credible victim reports a sexual assault, and when a credible witness provides corroborating information.

Nor was it clearly established that an officer must conduct an additional investigation or resolve purported inconsistencies before arresting or detaining a suspect.

To the contrary, the case law cited above indicates that "a police officer may rely on information provided to him by the victim or by an eyewitness to the crime that the officer reasonably believes is telling the truth," and that "[s]o long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest." *Jenkins*, 147 F.3d at 585; *Spiegel*, 196 F.3d at 725 ("The inquiry is whether an officer has reasonable grounds on which to act, not whether it was reasonable to conduct further investigation."); *Gerald M.*, 858 F.2d at 381 ("[T]he law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage.").[4]

At a minimum, the arrest and detention here were supported by arguable probable cause for the reasons explained above. *See Baker v. Fermon*, 799 F. App'x 921, 924, (7th Cir. 2020) (Even if an arrest lacks probable cause, "arguable probable cause will shield an officer from suit through qualified immunity if, under the same circumstances and well-established law, a reasonable officer could have found probable cause.").

*Second*, the due process claims are barred by qualified immunity because it was not clearly established that an officer violates the Constitution when he provides all evidence to the district attorney's office during the criminal proceedings. Nor did the law clearly require an officer to include all facts and information in his police reports (especially when all the information is included in the audio/video recording and provided to the district attorney's office). Nor was it clearly established that an officer violates the due process clause by failing to interview an individual (a lifeguard) or by failing to obtain a document (a sheet of paper) during

---

[4] *See also, Ruso v. Voorhees Township*, 403 Fed. Supp. 2d 252 (D. N.J. 2005) (False arrest claim dismissed as a matter of law where officer arrested suspect after woman reported he sexually assaulted her—despite officer not conducting any investigation prior to obtaining the warrant and not interview available witnesses, and where officer withheld from the complaint and judge the fact that officer knew the victim requested money from the suspect to keep quiet and had call logs demonstrating same).

an investigation (especially when it is entirely unknown whether that individual or document contains any favorable or exculpatory information).

The cases above all support a finding that no due process violation occurred here. *See Mosley*, 614 F.3d 391 at 397 (no violation when officers did not withhold any favorable information from prosecutor); *Jones*, 2021 WL 1614589 (no violation stemming from failure to include information in police report); *White*, 970 F.2d at 337 (Constitution does not "place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case."); *Tadros*, 310 F.3d at 1005 (7th Cir. 2002) ("This court has held many times that *Brady* does not require the government to gather information or conduct an investigation on the defendant's behalf."); *Horton*, 756 F.3d at 575 ("[M]ere speculation is not sufficient to sustain a *Brady* claim," and "hypothesizing that certain information, had it been disclosed to the defense, might have led [defense] counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized" is insufficient to establish due process violation.).

*Third*, the failure to intervene claims are barred by qualified immunity because it was not clearly established that an officer can be held liable for failing to intervene when there was no constitutional violation, when he did not make the charging or prosecutorial decisions, and when he acted reasonable by provided the district attorney's office with all evidence before and during the criminal proceedings so it could make the appropriate charging and prosecutorial decisions.

## VI.     ALL STATE LAW CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW.

### a.     The Court Should Decline Supplemental Jurisdiction.

Under 28 U.S.C. § 1367(c)(3) "district courts may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has

original jurisdiction…." *See Harvey v. Town of Merrillville*, 649 F.3d 526, 533 (7th Cir. 2011) ("[T]he usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."); *Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007) ("Generally, when a court resolves all federal claims before trial, it should dismiss supplemental claims without prejudice.").

If the Court dismisses all federal claims alleged in this lawsuit, it should decline supplemental jurisdiction over Plaintiff's state law claims.

### b. The State Law Claims are Barred Under Wis. Stat. § 893.80(1d).

Should the Court retain jurisdiction, it should dismiss the state law claims as a matter of law because Plaintiff failed to comply with Wis. Stat. § 893.80(1d) before filing this lawsuit.

Wis. Stat. § 893.80(1d)(a) requires – as a prerequisite to bringing a lawsuit against a governmental body – that notice be served within 120 days after the happening of the event. The notice must identify the circumstances that occurred within 120 days of the notice. *Probst v. Winnebago Co*., 225 Wis. 2d 753, 593 N.W.2d 478 (Ct. App. 1999). The 120-day period begins to run from the happening of the event forming the basis of the claim, not from the date the injury was discovered. *Carlson v. Pepin*, 167 Wis. 2d 345, 355, 481 N.W.2d (Ct. App. 1982). In addition, Wis. Stat. § 893.80(1d)(b) requires a party to serve the municipality with a separate written claim which includes an itemized statement of the relief sought. *Thorp v. Town of Lebanon*, 2000 WI 60, ¶ 28, 235 Wis. 2d 610, 612 N.W.2d 59. The purpose of this provision is to provide the municipality with an opportunity to avoid litigation and budget for a settlement or litigation. *Id.* ¶ 22. A lawsuit can only proceed after a written notice and claim have been submitted, and only after the claim has been disallowed. *Colby v. Columbia Cnty.*, 202 Wis. 2d

342, 550 N.W.2d 126 (1996). "Failure to comply with the statute constitutes grounds for dismissal of the action." *Casteel v. Vaade*, 167 Wis. 2d 1, 10, 481 N.W.2d 277 (1992).

Plaintiff in this case never submitted a written notice or claim, as required under Wis. Stat. § 893.80(1d). Nor did the Village disallow any claim. Accordingly, all state law claims must be dismissed as a matter of law.

### c. The Village of Lake Delton Did Not Prosecute Plaintiff and, Regardless, the State Law Claims are Barred Under Wis. Stat. § 893.80(4).

As a threshold matter, the Village of Lake Delton did not prosecute Plaintiff and thus cannot be held liable for a malicious prosecution claim. It is undisputed that Plaintiff's prosecution was initiated and conducted by the State of Wisconsin, through the District Attorney's Office.

The state law claims should also be dismissed as a matter of law because they are barred by discretionary immunity. Wis. Stat. § 893.80(4) protects municipalities and their officials from liability for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Wis. Stat. § 893.80(4); *Bicknese v. Sutula*, 260 Wis. 2d 713, 727, 600 N.W.2d 289 (2003); *Lodl v. Progressive Northern Ins. Co*., 2002 WI 71, ¶ 17, 253 Wis. 2d 323, 646 N.W.2d 314. This has been "interpreted to include any act that involves the exercise of discretion and judgment." *Id.* A discretionary act involves the "exercise of judgment in the application of a rule to specific facts." *Willow Creek v. Town of Shelby*, 2000 WI 56, ¶ 25, 235 Wis. 2d 409, 611 N.W.2d 693. The statute provides broad immunity from suit. *Lodl*, 2002 WI 71, ¶ 20. Whether immunity applies presents a question of law. *Id.*, ¶ 17.

Discretionary immunity is based on "public policy considerations that spring from an interest in protecting the public purse and a preference for political rather than judicial redress for actions," including: "the danger of influencing public officers in the performance of their

functions by the threat of a lawsuit; the deterrent effect which the threat of personal liability might have on those who are considering entering public service; the drain on valuable time caused by such actions; the unfairness of subjecting officials to personal liability for the acts of their subordinates; and the feeling the ballot and removal procedures are more appropriate methods of dealing with this conduct in public office." *Id.*; *Willow Creek*, 2000 WI 56, ¶ 33.

In this case, all state law claims are barred by Wis. Stat. § 893.80(4) because the decisions at issue – including, but not limited to, whether to bring criminal charges, whether to continue the criminal proceedings, and whether/how to investigate – all required the exercise of judgment and discretion. *See Recore v. Cnty. of Green Lake*, 2016 WI App. 33, 368 Wis. 2d 282, 879 N.W.2d 131 (scope of sexual abuse investigation was discretionary and therefore protected by immunity); *Barillari v. City of Milwaukee*, 194 Wis. 2d 247, 255, N.W.2d 759 (1995) (same); *Olson v. 3M Co.*, 188 Wis. 2d 25, 50, 523 N.W.2d 578 (Ct. App. 1994) (police investigation requires the exercise of judgment and discretion). Furthermore, to the extent the state law claims are alleged directly against the Village, they are barred under Wis. Stat. § 893.80(4), which indicates "no suit may be brought against any … political corporation … for the intentional torts of its officers, officials, agents or employees…." *See Milligan v. Cichacki*, 110 Wis. 2d 741, 330 N.W.2d 247 (Ct. App. 1982) (malicious prosecution is an intentional tort and thus cannot be alleged against a municipality).

### d. The Record is Insufficient to Establish a Malicious Prosecution Claim.

The malicious prosecution claim should also be dismissed because the record is insufficient as a matter of law to prove the elements of that claim.

A plaintiff must prove the following elements to establish a malicious prosecution claim: 1) a criminal proceeding was brought against the plaintiff; 2) the defendant was actively involved

in instigating the criminal proceeding; 3) the criminal proceeding was terminated in favor of the plaintiff; 4) the defendant acted with malice in instigating the criminal proceeding; 5) the criminal charges were made without probable cause; and 6) the plaintiff suffered damages. Wis. Civ. J.I. 2600, Malicious Prosecution.

With respect to **element 2**) above**,** courts have held that an officer "instigates" the criminal proceeding if he insisted the criminal charges be brought, or if he insisted the prosecution be continued. *Bautista v. Vill. of Lomira*, 2013 WL 2405443, at *15 (E.D. Wis. 2013). As explained above, ADA Spoentgen and ADA Hoffman admitted it was their decision to bring criminal charges, and it was their decision to continue the criminal proceedings. There is no evidence that the Village, Detective Killick or Detective Posewitz instigated or influenced those decisions.

With respect to **element 4**) above, there is no evidence that the Village, Detective Killick or Detective Posewitz acted with ill will, a vindictive motive, or a purpose other than bringing justice. *See Meyer v. Ewald*, 66 Wis. 2d 168, 224 N.W.2d 419 (1974) (to prove malice, a plaintiff must show the defendant acted with ill will or a vindictive motive, or that he instigated the proceedings for a primary purpose other than bringing the offender to justice). They investigated the matter because Monique made a complaint regarding a child sexual assault, and because a 15-year-old child, G.C., reported she was sexually assaulted. The matter was then referred to the District Attorney's Office so it could independently review of the evidence and determine whether and how to proceed.

With respect to **element 5**) above, the numerous cases cited above indicate that, in sexual assault cases, the statement of the victim is often the only evidence needed to establish probable

cause for an arrest. As explained in detail above, G.C. and Monique were interviewed before the arrest and provided sufficient information to establish probable cause.

**e.**     **The Record is Insufficient to Establish an Intentional Infliction of Emotional Distress Claim.**

The intentional infliction of emotional distress claim ("IIED") should also be dismissed because the record is insufficient as a matter of law to prove the elements of that claim.

A plaintiff must prove the following elements to establish an IIED claim: 1) defendant's conduct was intentioned to cause emotional distress; 2) defendant's conduct was extreme and outrageous; 3) defendant's conduct was a cause-in-fact of the emotional distress; and 4) plaintiff suffered an extreme disabling emotional response. *Rabideau v. City of Racine*, 2001 WI 57, ¶ 33, 243 Wis. 2d 486, 501, 627 N.W.2d 795.

There is no evidence in this case that the Village, Detective Killick or Detective Posewitz conducted the investigation for the purpose of causing Plaintiff emotional distress. As noted above, the investigated the matter because the LDPD received a complaint, and because G.C. reported she was sexually assaulted. Finally, there is no evidence that Detective Killick or Detective Posewitz engaged in any extreme or outrageous conduct.

## CONCLUSION

For these reasons, Village of Lake Delton, Shawn Posewitz, and Lucas Killick respectfully ask the Court to grant their Motion for Summary Judgment and dismiss all claims alleged against them as a matter of law.

Dated this 22nd day of October, 2021.

**MUNICIPAL LAW & LITIGATION GROUP, S.C.**
Attorneys for Village of Lake Delton, Shawn Posewitz and Lucas Killick.

By:    /s/ Matteo Reginato
      REMZY D. BITAR

State Bar No: 1038340
MATTEO REGINATO
State Bar No: 1089724

730 N. Grand Avenue
Waukesha, WI 53186
O: (262) 548-1340
F: (262) 548-9211
E: rbitar@ammr.net
mreginato@ammr.net