IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOSE GARCIA,

                Plaintiff,

        v.

VILLAGE OF LAKE DELTON,
SHAWN POSEWITZ, LUCAS KILLICK,
RICK SPOENTGEN, and LINDA HOFFMAN,

                Defendants.

OPINION AND ORDER

20-cv-988-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In October 2016, the State of Wisconsin charged plaintiff Jose Garcia with two felony counts of sexual assault of a child based on allegations that he had fondled the breasts and vaginal area of a teenaged family friend, G.C., while in a pool at a Wisconsin Dells resort. Garcia was arrested and spent two nights in jail before being released on bond. A few months later, a state circuit court judge found after a hearing that probable cause existed to believe Garcia had committed the crimes charged in the complaint, and he ordered Garcia bound over for trial. The case proceeded to trial in February 2018 but ended quickly when the court declared a mistrial because of certain remarks made by the prosecutor in her opening statement. The case was then transferred to a new prosecution team, which decided to dismiss the charges.

Garcia then filed this action under 42 U.S.C. § 1983 against the detectives who investigated the sexual assault allegations, the prosecutors who filed the complaint and sought his conviction, and the Village of Lake Delton, pleading five counts: (1) false arrest; (2) unlawful detention; (3) violation of due process; (4) failure to intervene; and (5)

malicious prosecution under state law.  Defendants have moved for summary judgment on all claims.  Dkts. ## 31, 37.  Plaintiff concedes that he is no longer pursuing any claims against Detective Lucas Killick or the claims asserted in Counts III through V of the complaint.  Accordingly, the only claims remaining are plaintiff's false arrest claim against defendants Shawn Posewitz, Rick Spoentgen, and Linda Hoffman and plaintiff's unlawful detention claim against Posewitz.

Defendants' motions for summary judgment will be granted.  There is no real dispute that G.C.'s account, if true, established probable cause to support charging and arresting plaintiff for sexual assault of a child; indeed, a state court judicial officer found as much and issued a warrant for plaintiff's arrest.  Plaintiff's case turns on establishing that defendants withheld from the warrant-issuing judge information that any reasonable officer would have known was material to the probable cause determination.  As explained in more detail below, plaintiff falls far short of making this showing.  Accordingly, I conclude that defendants are immune from suit under the doctrine of qualified immunity.

The following facts are material and undisputed, unless otherwise noted.

## FACTS

In October 2016, plaintiff Jose Garcia, a resident of Illinois and a Chicago police officer, was charged in the Circuit Court for Sauk County, Wisconsin with sexual assault of a child, G.C.  At the relevant times, defendants Linda Hoffman and Rick Spoentgen were

assistant district attorneys for Sauk County.  Defendant Shawn Posewitz was a detective for the Lake Delton Police Department.

### A.  G.C.'s Mother Reports a Sexual Assault to Officer Spencer

The sexual assault allegations arose from a report filed with the Lake Delton Police Department by telephone on August 23, 2016.  On that date, Monique C., the victim's mother, called the police department and spoke to Officer Troy Spencer, who documented the phone call in an incident report.  According to Spencer's summary of Monique's report, Monique said the assault had occurred while her family and another family were vacationing together from August 15-19, 2016 at a waterpark resort in Wisconsin Dells, where they shared a hotel suite.  Monique reported that on August 18, 2016, her 15-year-old daughter, G.C. had told her that the father of the other family, plaintiff Jose Garcia, had touched her breasts and vagina while the two were in a pool in the Lost World water park on August 18, 2016.  G.C. told Monique that the assault occurred after Monique and her husband had gone upstairs to the hotel suite and plaintiff and the kids were still in the pool, where he was throwing G.C. and the other kids up in the air.  G.C. told Monique that before throwing her into the air, plaintiff had pulled her in close to him with her back to his chest and rubbed her breasts and vagina over her swimsuit. G.C. said the other kids were far enough away that they could not see plaintiff doing this to her, and that when they got closer to them, he then picked her up and threw her in the water.

Spencer's report further states:

3

GC advised her mother after being touched that one time by Jose, he approached her a second time and asked if she liked it.  GC advised her mother she told Jose no and exited the pool.  GC advised her mother that after exiting the pool, she was sitting at the table when Jose approached her.  Jose told GC that he was sorry, but he liked her.  GC advised her mother that Jose had her pinky swear not to tell anyone about the incident.  GC advised her mother there was another interaction inside their condo where Jose told GC that he liked her again and asked if she wanted him to touch her.  GC advised her mother Jose only touched her inappropriately once, however, she felt uncomfortable being around Jose.

### B.  Posewitz Investigates Monique's Complaint

Detective Posewitz, a detective trained in forensic interviewing who has investigated hundreds of sexual assault investigations during his career, was assigned to investigate Monique's report.

### 1.  Interview of G.C.

Posewitz interviewed G.C. on August 25, 2016.  G.C. agreed to be video-recorded.  During his interview with G.C., Posewitz confirmed that G.C. understood the difference between the truth and a lie, and that it was "important to tell the truth."  G.C. told Posewitz that plaintiff had been a family friend of her mom's for 25 years, that the two families had gone on family trips together and that she was good friends with plaintiff's daughters.  G.C. said that she had been in the pool area with her siblings, plaintiff, and plaintiff's family on August 18, 2016, when plaintiff approached her from behind and grabbed her breasts while they were in the pool.  G.C. estimated that the touching lasted for two minutes.  G.C. said her parents were not present at the time of the assault because they had already returned to

the hotel suite.  According to G.C., the assault happened "by the lifeguard . . . by like the slides and everything."  She further told Posewitz that plaintiff approached her again about 10 minutes later, asked her to "come over here and sit on [his] lap" and "pulled [her] on his lap in the water," where he proceeded to touch her vagina area for two minutes.  G.C. said she had not given plaintiff consent to touch either her breasts or her vagina area.  According to G.C., she exited the pool by faking that she had to go to the bathroom while she was sitting on his lap and he was rubbing her vagina.  After she had exited the pool, G.C. said, plaintiff reapproached her and asked her to "pinky swear" not to tell anyone about the sexual assault.

G.C. told Posewitz that everyone then returned to the suite.  G.C. went on the balcony with her mother (Monique) and started to tell her about the sexual assault. According to G.C., while she was on the balcony, plaintiff kept "eyeballing" her, like he was trying to get her attention.  G.C. stopped talking to her mother because plaintiff came outside on the balcony and stood near her mother, trying to get G.C.'s attention.

G.C. then described what happened over the next several hours, including that her parents, her siblings, plaintiff and plaintiff's wife went back to the pool later that evening, while she stayed back in the suite with two of plaintiff's daughters.  According to G.C., shortly after the large group left to go to the waterpark, plaintiff returned to the suite by himself, where the two had this conversation:

> [Plaintiff] said 'was that uncomfortable for you?' and 'I really like you,' and 'are you okay with me doing that?' and I was like, 'no, I'm not okay with you doing that.  That's not cool ....  And he asked me those questions and I was like, 'No, I'm not – that was not cool of you to do that to me.' And he was

like, 'I really like you though,' and I'm like, 'Yeah, but that's so wrong.  Don't
do that to me ever again.'

G.C. said that plaintiff then hugged her, at which point her parents walked in.  She said

plaintiff was startled by her parents' arrival, and that he immediately "ran off of [her] to like

make sure that [her parents] didn't see what was happening."  G.C. said plaintiff claimed to

have returned to the hotel suite to use the bathroom, but she never saw him use it and

believed that he only came there to talk to her.  G.C. said she was able to tell her mother,

in private, that plaintiff had also touched her "down there."  She said she slept in her

mother's bedroom that night because she was "very scared."

### 2. Interview of Monique

Detective Posewitz interviewed Monique on August 25, 2016.  With her consent, the

interview was video-recorded.  Monique told him that she and Jose had been friends for 25

years and that Monique and Jose and their respective families treat each other more like

family than friends, including vacationing together and sharing family events.  Monique said

she was not present when G.C. was sexually assaulted in the pool area because she had

already returned to the hotel suite.  She said G.C. had started telling her about the assault

on the balcony but stopped when plaintiff came outside on the balcony like he was "trying

to see if [G.C.] was telling [Monique]" about the assault.  Monique told Posewitz that after

G.C. told her about the assault when the two were on the balcony, Monique determined that

the best course was to act as normally as possible and have G.C. stay near her until the end

of the vacation, which was the following day.

Monique confirmed that most of the family members went back to the pool later that evening on the day of the assault while G.C. stayed back in the hotel suite.  She said that she and her husband got on the elevator with plaintiff to ride down to the pool on the first floor, but plaintiff "ran out."  When the elevator arrived on the first floor, someone in the group told Monique that plaintiff had gone back to the suite to use the bathroom.  Monique told Posewitz that, upon hearing this, she then rushed back to the suite, where she encountered plaintiff, who looked startled.  Monique reported that G.C. told her privately while Monique was in the suite that plaintiff didn't have to go to the bathroom.  G.C. also said to Monique: "Do you know he touched me down there?" According to Monique, she told G.C. that she was going to get plaintiff out of the room and would talk to her more later, and that she didn't want plaintiff to suspect anything.  Monique explained that although she was not sure at the time whether G.C. meant that plaintiff had touched G.C. "down there" when he returned to the hotel suite, G.C. later clarified that it was "all in the pool."

Monique told Posewitz that the day after the assault, both families again went to the waterpark, where she sat with G.C. near the outdoor pool.  Monique observed plaintiff watching her and G.C. "like a hawk" and said he repeatedly approached them to ask if they'd seen his daughter, even after Monique had said she had not.  Plaintiff took a number of other actions which led Monique to believe he was trying to stay close to G.C. to determine if she was reporting the assault.

During the interview, Monique told Posewitz that G.C.'s brother had also noticed plaintiff acting oddly.  Monique said that G.C.'s brother told her that he had seen plaintiff

7

and G.C. "pinky swear" before they left the pool on the day of the sexual assault, a fact that G.C. had not recalled until her brother noted it.  Monique said G.C.'s brother also said that he had noticed plaintiff staring at G.C. while she was out on the balcony with Monique.  Finally, G.C.'s brother told Monique that he had told plaintiff there was a public bathroom on the first floor while they were headed down to the pool the evening of the assault, but plaintiff returned to the hotel suite, up four flights of stairs, to use the restroom instead.

3.  Review of Video Footage of Pool Area

On August 26, 2016, Posewitz met with the security director of the resort and reviewed the surveillance footage of the pool area where G.C. reported plaintiff had sexually assaulted her.  He also asked the resort to pull up incident reports to see if any lifeguard reported anything on that date and time anywhere in that pool area.  Posewitz was unable to locate any family members in the video footage because it was grainy, the cameras were located far away from the area where G.C. said the assault occurred, and there were numerous patrons in and around the area.  Posewitz prepared a report stating that the surveillance video did not provide "any inculpatory or exculpatory evidence" in the case.

C.  Spoentgen Drafts a Complaint and the Court Issues an Arrest Warrant

Posewitz prepared reports describing his interviews with G.C. and her mother and his review of the video footage from the pool area.  He forwarded these reports, Officer Spencer's report of his August 23 phone conversation with Monique, the video footage from

the pool, and video footage of the two interviews to the Sauk County District Attorney's office.

Posewitz's materials were reviewed by defendant Rick Spoentgen, an assistant district attorney, who determined there was enough evidence to support charging plaintiff with two counts of sexual assault of a minor in violation of Wis. Stat. §§ 948.02(2) and 939.50(3)(c), a class C felony. Spoentgen drafted a criminal complaint that summarized G.C.'s account of the assaults as recorded by Detective Posewitz. At the end of the complaint, Spoentgen wrote:

> I believe the statements of G.C. to be truthful and reliable as they are statements by [sic] ordinary citizen. I know that Detective Posewitz provided the above information n the ordinary course of his professional duties as a law enforcement officer and, therefore, believe the above information to be accurate and reliable.

> Signed and sworn to before me and approved for filing this 3rd day of Oct. 2016.

Posewitz signed the complaint under oath on October 3, 2016. Spoentgen approved the criminal complaint and attested to the swearing of the complaint by Posewitz.

The complaint and an accompanying arrest warrant were submitted to Circuit Court Commissioner Leo Grill. Commissioner Grill found probable cause and signed the arrest warrant on October 3, 2016. On October 4, 2016, Posewitz and another detective went to the Chicago Police Department to interview plaintiff. Plaintiff denied the sexual assault and said his attorney advised him not to discuss the matter. After the interview, plaintiff was arrested by members of the Chicago Police Department and detained until he had an extradition hearing the next day. Plaintiff agreed that he would report voluntarily to the

9

Sauk County jail, which he did that same day.  After a night in jail, plaintiff had an initial appearance on October 6, 2016, at which the court set conditions of his bond.

### D.  Plaintiff's Case is Dismissed After a Mistrial

Plaintiff's case was assigned to defendant Hoffman on October 4, 2016, although she had some involvement before that date.  Specifically, at some point prior to plaintiff's arrest, defendant Hoffman suggested to Spoentgen that he speak to Posewitz about having G.C. contact plaintiff in a "pretext" call, but G.C. declined to make such a call.  Hoffman also discussed whether to use an arrest warrant or issue a summons to plaintiff.

The Sauk County Circuit Court held a preliminary hearing on February 16, 2017, at which Detective Posewitz testified.  Plaintiff's counsel cross-examined Posewitz about his investigation and the video recordings from the pool area, and urged the court to dismiss the case.  The court declined to do so, finding probable cause that plaintiff committed sexual assault of a child.

The criminal case against plaintiff proceeded to the first day of trial, including voir dire, empaneling a jury, and opening statements.  During her opening statement, Hoffman mentioned that G.C. had some type of learning disability.  Defense counsel objected and moved for a mistrial on the ground that the State had not disclosed such evidence during the discovery.  The trial court granted the motion.

After the mistrial, the case was transferred to Spoentgen and then -District Attorney Kevin Calkins because Hoffman was transferring to a new position as a victim witness

coordinator.  Spoentgen and Calkins both reviewed the case file and determined that there was insufficient evidence to prove plaintiff's guilt beyond a reasonable doubt.  Accordingly, on October 1, 2018, the State filed a motion to dismiss the case, on the ground that "The State will not be able to present sufficient credible evidence at trial to prove the charged offenses."  The circuit court granted the motion and dismissed the charges.  In an email to a Chicago Police Internal Affairs Sergeant explaining why they dismissed the case, DA Calkins explained that "[w]hen Rick and I inherited this case from [Hoffman] and reviewed it in detail, we simply concluded we could not meet our burden of proof on the charges; there were significant inconsistencies in the victim's statements of the event and when we compared her version against what little video evidence we could recover, it did not match up."

Plaintiff then filed the present suit.


OPINION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In deciding a motion for summary judgment,

the court views the facts in the light most favorable to the non-moving parties.  Crull v. Sunderman, 384 F.3d 453, 460 (7th Cir. 2004).

As noted previously, plaintiff contests summary judgment only with respect to the false arrest and unlawful detention claims asserted in Counts I and II of the complaint.  In these claims, plaintiff alleges that he was arrested and detained by defendants without probable cause, in violation of his rights under the Fourth Amendment and Fourteenth Amendments.  He seeks damages from Posewitz, Spoentgen, and Hoffman for their roles in investigating G.C.'s allegations and obtaining a warrant for his arrest and from Posewitz for "exerting influence" to initiate and perpetuate the judicial proceedings against him without probable cause.

As a preliminary matter, the parties dispute the extent to which each of these defendants was responsible for investigating G.C.'s allegations and ensuring the reliability of the criminal complaint and, correspondingly, whether Spoentgen and Hoffman are entitled to absolute prosecutorial immunity.  They further dispute, as a legal matter, whether principles of issue preclusion prevent plaintiff from contesting probable cause in this forum given that the Sauk County Circuit Court found probable cause at the preliminary hearing. Although these issues raise interesting factual and legal questions, it is unnecessary to address them.   Even if issue preclusion does not apply and even if all three defendants bear responsibility for what was included in the complaint, they are immune from damages under the doctrine of qualified immunity.  Fields v. Wharrie, 740 F.3d 1107, 1111 (7th Cir. 2014)

(prosecutors who engage in investigative work lose absolute immunity but have qualified immunity).

At the outset, it is important to note that the state's decision not to retry plaintiff after the mistrial does not establish that the defendants lacked probable cause to arrest, detain or prosecute him.  Kompare v. Stein, 801 F.2d 883, 891 (7th Cir. 1986).  Even when the state fails to prove guilt beyond a reasonable doubt, it does not follow that it did not meet the lesser probable cause standard:  a reasonable belief that an offense has been committed and that the criminal defendant committed the crime.  Williams v. Kobel, 789 F.2d 463, 470 (7th Cir. 1986).  See also Brinegar v. United States, 338 U.S. 160, 175 (1949) ("The substance of   . . . probable cause is a reasonable ground for belief of guilt," lying somewhere between "bare suspicion" and evidence sufficient to convict.) (citation omitted).  As the Supreme Court has explained:  "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released." Baker v. McCollan, 443 U.S. 137, 145 (1979).

Qualified immunity protects government officials from liability, even in cases with plainly bad outcomes, if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when

13

they perform their duties reasonably." Id.  "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).  "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (citation omitted).

No one disputes that at the time plaintiff was arrested in this case, he had a clearly established right under the Fourth Amendment not to be arrested without probable cause. See, e.g., Beck v. Ohio, 379 U.S. 89, 91 (1964) ( "Whether that [the defendant's] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it...."). The question before this court is whether a reasonable officer could have believed plaintiff's arrest was lawful, in light of the clearly established right to be free from arrest without probable cause and based on the information defendants had at the time they prepared and signed the criminal complaint.  Tangwall v. Stuckey, 135 F.3d 510, 518 (7th Cir. 1998) ("[Q]ualified immunity will shield a law enforcement officer ... from § 1983 liability 'if a reasonable officer could have believed the [arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'") (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)) (emphasis omitted and alterations in original).  Although the privilege of qualified immunity is a

14

defense, the plaintiff bears the burden of defeating it.  Betker v. Gomez, 692 F.3d 854, 860 (7th Cir. 2012).

Plaintiff's burden in this case is particularly heavy because defendants obtained a warrant from a judicial officer authorizing plaintiff's arrest.  "[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" Messerschmidt v. Millender, 565 U.S. 535, 546–48 (2012) (quoting United States v. Leon, 468 U.S. 897, 922–923 (1984)).  In this situation, defendants are entitled to qualified immunity unless the warrant-issuing judged "so obviously erred" in finding probable cause to believe plaintiff committed the charged offense that "any reasonable officer would have recognized the error." Id. at 556.  To make this showing, plaintiff must demonstrate that defendants "intentionally or recklessly withheld material facts from the warrant-issuing judge." Leaver v. Shortess, 844 F.3d 665, 669 (7th Cir. 2016) (quoting Whitlock v. Brown, 596 F.3d 406, 410 (7th Cir. 2010)). See also Schertz v. Waupaca Cty., 875 F.2d 578, 582 (7th Cir. 1989) (if state court finding of probable cause is based on the defendant's intentional misrepresentation or concealment of material facts, plaintiff may be able to proceed on a Fourth Amendment claim challenging the reasonableness of an arrest).

As noted previously, the complaint recounts G.C.'s statements during her interview with Detective Posewitz.  "[I]t is well-established that '[w]hen an officer has received . . . information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has probable cause.'" Spiegel v. Cortese,

196 F.3d 717, 724 (7th Cir. 1999), as amended (Jan. 7, 2000) (quoting Tangwall, 135 F.3d at 519); see also Pasiewicz v. Lake Cty. Forest Pres. Dist., 270 F.3d 520, 524 (7th Cir. 2001) ("When police officers obtain information from an eyewitness or victim establishing the elements of a crime, the information is almost always sufficient to provide probable cause for an arrest in the absence of evidence that the information, or the person providing it, is not credible."); Gramenos v. Jewel Companies, Inc., 797 F.2d 432, 439 (7th Cir. 1986) ("Probable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth, that matters."); McKinney v. George, 726 F.2d 1183, 1187 (7th Cir. 1984) ("If the police have probable cause, the arrest is lawful; and they have probable cause if they believe, with reason, that their informant was telling the truth.").  Further, once probable cause has been established, "officials have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence," nor must they delay arresting a suspect "until after they have conclusively resolved each and every inconsistency or contradiction in a victim's account." Spiegel, 196 F.3d at 723, 725 (internal quotation marks and citation omitted).

Plaintiff does not argue that the complaint misstates or falsely represents what G.C. told the detective, nor does he suggest that her statements, if true, were insufficient to establish probable cause that plaintiff had committed the crime of sexual assault of a child. Instead, he argues that defendants omitted facts from the complaint that were material to G.C.'s credibility, and in turn, the probable cause determination.  Specifically, plaintiff points to these facts:  (1) in her August 23, 2016 phone call with Officer Spencer, Monique

reported that G.C. had told her that plaintiff had touched her breasts and vaginal area "one time" while in the pool, then approached her after that one time and asked her if she liked it, at which point she exited the pool; (2) Monique told Detective Posewitz that, before contacting the police, Monique told G.C.'s brother to sit down with her to help her remember what happened; (3) according to Monique, G.C. did not recall "pinky swearing" with plaintiff until her brother reminded her; (4) Monique told Posewitz that G.C. became upset and afraid when she learned there was surveillance video of the pool where the alleged assaults occurred, fearing that the video might contradict her story; and (5) the surveillance video "did not support" G.C.'s allegations.

Even when viewed in the light most favorable to plaintiff, no reasonable jury could conclude that it would have been clear to a reasonable officer that these omitted facts were material to the probable cause determination.  Importantly, "[p]robable cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed."  Beauchamp v. City of Noblesville, Ind., 320 F.3d 733, 743 (7th Cir. 2003) (citing Illinois v. Gates, 462 U.S. 213, 244 n. 13 (1983)).  Of the five items identified by plaintiff, the only one that is arguably "inconsistent" with G.C.'s report is Officer Spencer's summary of Monique's August 23 phone call to the police department.  As plaintiff points out, Officer Spencer's report says that Monique said that G.C. originally told her that plaintiff touched G.C.'s breasts and vaginal area on "one occasion" in the pool, whereas G.C. told Detective Posewitz that plaintiff touched her breasts in the pool and then re-approached her about 10 minutes later and touched her vagina in the pool.

Contrary to plaintiff's argument, the fact that Spencer's report details an account from G.C. that is inconsistent in some respects from what she told Posewitz would not have negated probable cause.  First, regardless whether plaintiff allegedly touched G.C. on only "one occasion" as stated in Officer Spencer's summary, that one reported touching would have been enough to establish a reasonable likelihood that plaintiff committed a sexual assault of G.C..  Second, the information included in Officer Spencer's summary was in many respects *consistent* with what G.C. told Posewitz, namely that:   (1) plaintiff inappropriately touched her breasts and vaginal area; (2) the touching occurred in the pool; (3) certain individuals were nearby at the time; (4) plaintiff approached G.C. after she exited the pool; (5) G.C. "pinky swore" with plaintiff who told G.C. not to tell anyone about the assault; and (6) plaintiff returned to the hotel suite later that evening to discuss the assault with G.C. after the rest of the group left the hotel suite.  As anyone who has played the game of "Telephone" knows, the fact that Spencer's third-hand summary of what G.C. purportedly told Monique did not precisely match what G.C. told Posewitz is unsurprising, and it does not come close to supporting an inference that defendants could not reasonably have found G.C. to be generally credible.  Spiegel, 196 F.3d at 725 ("Nothing suggests that a victim's report must be unfailingly consistent to provide probable cause.").

This is particularly so given that G.C.'s account was corroborated in significant respects by Monique.  After receiving Monique's report, Posewitz investigated further to determine what information Monique knew, and what G.C. reported to her, by interviewing Monique on August 25, 2016.  During that interview, Monique provided a narrative of

18

events, including what G.C. had told her about the assault, that was largely consistent with G.C.'s account of plaintiff touching her twice – once on the breasts and once on her vaginal area – while the two were in the pool after her parents had gone upstairs to the hotel suite. The consistency of G.C.'s statements to Monique and to the police gave defendants further reason to believe that G.C. was telling the truth, even though the accounts were not 100% consistent.

What is more, plaintiff's argument overlooks the absence of any evidence suggesting that G.C. or Monique had any motive to fabricate the allegations against plaintiff. Both G.C. and her mother told Posewitz that Monique and plaintiff had been friends for 25 years, that the two families were extremely close, and that G.C. was friends with plaintiff's daughters. Plaintiff has not identified any evidence in the record to suggest that G.C. or her mother were pursuing a grudge or had other reasons to destroy their long-standing and by all accounts valuable relationships with plaintiff, his wife, and his children. Absent such evidence, and having received a cogent, coherent and corroborated account from G.C. about the assaults and the events afterward, defendants reasonably found G.C.'s account to be credible and they were entitled to rely on it as a basis for probable cause. Gramenos, 797 F.2d at 440("report of an eyewitness who has good reasons to tell the truth" can establish probable cause and police need not conduct further investigation or put contradictory evidence in warrant affidavit).

The remaining omissions identified by plaintiff likewise are not those that a reasonable officer would have recognized as negating probable cause. That G.C.'s brother

helped her remember that she "pinky swore" with plaintiff would have been a good avenue for cross-examination at trial, but it fails to suggest that G.C. was obviously lying about the assaults.  Spiegel, 196 F.3d at 725 ("The credibility of a putative victim or witness is a question, not for the police officers in the discharge of their considerable duties, but for the jury in a criminal trial.").  Likewise, although G.C.'s apparent nervousness upon learning that there was video surveillance of the pool area could support an inference of fabrication, it is equally reasonable to infer that it simply reflects G.C.'s concern, given the gravity of her allegations, that she not "make a mistake" about the details.  See Monique Dep., dkt. 60-3, 52:14-20 (describing G.C. as saying "What if I make a mistake and I say something wrong and the video camera says something different?").

As for the surveillance footage of the pool area, plaintiff points out that Posewitz acknowledged at the preliminary hearing that he "didn't see evidence in the video to suggest that someone was sitting on someone's lap for a two-minute period of time."  But this shows at most that the video was not inculpatory, not that it was exculpatory.  Posewitz also testified he could see "bodies next to each other for long periods of time," but, because of the poor video quality, he simply could not tell whether the bodies were in contact, much less whether it was plaintiff and G.C.  In addition, he testified that, based on his training and experience, "time frames, especially with children, do not mean a lot whatsoever," and that child trauma victims often "don't have a distinction of how much time elapses."  Posewitz Dep., dkt. #43, at 267:13-19.  In Posewitz's view, the footage was neither inculpatory nor exculpatory, and he conveyed that belief to the district attorney's office in his report along

with the footage.  Plaintiff has not identified anything in the record to suggest that Posewitz was lying about his impression of the video, much less that the grainy and inconclusive video footage would have negated probable cause.  (Insofar as plaintiff relies on his own review of what the video shows, see PPFOF Nos. 383-401, that review is based at least in part on information provided by G.C. and Monique that defendants did not have until after plaintiff's arrest.  Accordingly, it is immaterial to the probable cause determination.  Spiegel, 196 F.3d at 723 ("The existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information.").)

In short, it would not have been clear to a reasonable officer that G.C.'s account was not credible or that the information plaintiff claims defendants wrongly omitted from the complaint would have negated probable cause.  Accordingly, they were entitled to presume that the arrest warrant issued by Commissioner Grill was valid, and they are immune from liability on plaintiff's § 1983 claims.

ORDER

IT IS ORDERED that:

1.  The motion of defendants Lucas Killick, Shawn Posewitz and the Village of Lake Delton for summary judgment, dkt. #37, is GRANTED;

2.  The motion of defendants Rick Spoentgen and Linda Hoffman for summary judgment, dkt. #31, is GRANTED;

3.  Plaintiff's motion to strike, dkt. #73, is DENIED as moot; and

4.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 24th day of January, 2022.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

22